## PROCTOR & GAMBLE COMPANY *v.* BLAKELY OIL & FERTILIZER COMPANY.

1. When a plaintiff offers evidence which is essential to make out his case and the court excludes it, he may decline to introduce further evidence, without dismissing his action or voluntarily submitting to a nonsuit, and will not thereby be prevented from excepting to the direction of a verdict for the defendant, after the court has allowed the latter to introduce evidence.

2. "A witness can not, without finally testifying from his recollection of the facts, swear from a memorandum without showing that he made the memorandum or at some time knew it to be correct."

3. Where no direct evidence of the execution of a written instrument is attainable, its execution may be proved by circumstances. The circumstantial evidence as to the execution of a written instrument, proof of the legal existence and contents of which was necessary to make out the plaintiff's case, and which was shown to be in existence and beyond the control of the plaintiff and the jurisdiction of the court, was sufficient to authorize the admission in evidence of a proved copy of the same.

4. In a suit upon an alleged common-law award, the plaintiff makes out a prima facie case by proving the submission as alleged, and the award as declared on, in accordance therewith.

Argued April 23,—Decided July 10, 1907.

Arbitration and award. Before Judge Wright. Early superior court. April 21, 1906.

The Proctor & Gamble Company, of Cincinnati, Ohio, a corporation, sued the Blakely Oil & Fertilizer Company, a corporation of Blakely, Ga., to recover the sum of $1,732.38, and interest thereon from May 17, 1903. The petition made the following allegations: On March 25, 1903, the plaintiff purchased of the defendant "two tanks of crude cottonseed oil, on a basis of prime," as appeared by reference to a copy of the contract, attached to the petition and marked as an exhibit. "Upon the arrival of said oil at destination, a difference arose between plaintiff and defendant as to the quality of same and as to what allowance should be allowed plaintiff off the contract price of 33½ cents per gallon, both parties to the contract agreeing that the oil was not prime crude, and plaintiff having already paid for said oil, at the contract price of 33½ cents per gallon, as prime crude." In accordance with the terms of the contract, as shown by the copy thereof attached as an exhibit, "and by agreement between plaintiff and defendant, the said differences as to quality and as to what allowance per gallon plaintiff should be allowed off the contract price were submitted to the arbitration committee on cottonseed products, of the Memphis, Tennessee, Merchants Exchange, for arbitration and award in accordance with the rules and regulations of" such exchange applicable to such cases. A copy of the alleged submission to arbitration was attached as an exhibit. This arbitration committee, on May 7, 1903, made an award, "in which they decided that the oil was not prime crude, and in which they allowed plaintiff 13 cents per gallon on each tank," a copy of the award being attached as an exhibit. The two tanks to wit:

P & G 85—No. 49700 and P & G 532—No. 50250, contained, respectively, 6626 and 6700 gallons." The "defendant is indebted to the plaintiff on and by reason of said award in the sum of $1,732.38, together with interest thereon, at the legal rate, from May 7, 1903, the date of the award," which it fails and refuses to pay. The copy of the contract, attached to the petition, was, as follows:

"Julian Field, Broker.   Cottonseed Products.   231/2 West Alabama St.

"Atlanta, Ga., March 23, 1903. Sold to the Proctor and Gamble Company, Cincinnati, Ohio. For account of Blakely Oil and Fertilizer Co., Blakely, Ga., Amount: Two (2) tanks of about 150 barrels of crude cottonseed oil, on basis of prime. Shipment: Prompt. Price: Thirty-three and one half cents (331/2 cents) per gallon, F. O. B. buyer's tank cars at Blakely, Ga., weights guaranteed at destination. Terms: Cash against B/L, free of exchange. Any difference between buyer and seller under this contract subject to arbitration before Memphis Merchants Exchange, Memphis, Tenn. Subject to rules of Interstate Crushers Association. Sellers to pay brokerage.

Julian Field, broker.

"Accepted 3/25/'03.   Blakely Oil & Fertilizer Co.,   T. B. McDowell, Sec. & Treas."

The alleged copy of an agreement for arbitration, which it is unnecessary to set out in full, stipulated that the parties signing it agreed to submit the differences and controversies existing between them "to the arbitration and decision of the Arbitration Committee on cottonseed products of the Memphis Merchants Exchange, or a quorum of them," and authorized said arbitration committee, or a quorum thereof, "to arbitrate, award, adjust, and determine" the matter. It then concluded as follows: "A decision is desired upon the following points: Whether or not samples marked P and G 85 and 532, Blakely, Ga., April 7th, contain prime crude cottonseed oil: If not, to what allowance per gallon is the Proctor and Gamble Co. entitled. Samples to be submitted by the Proctor and Gamble Co. and properly tested by the official chemist. The Blakely Oil and Fertilizer Company, per————." The alleged award declared on, as shown by the exhibit thereof attached to the petition, was as follows: "Mem-

phis, Tenn.; May 7, 1903. In the case of the Blakely Oil and Fertilizer Co., Blakely, Ga., vs. the Proctor and Gamble Co.; Cincinnati, Ohio, we decide that oil contained in samples representing P and G tanks 85 and 532 is not prime crude cottonseed oil. The Proctor and Gamble Co. is allowed thirteen cents per gallon on each tank. J. Myers, chemist, J. J. Parish, H. C. Hoskins, F. W. Brode, A. H. D. Perkins, Arbitration Committee C. S. Products.

"A true copy. (Seal) N. S. Graves, Secretary."

The defendant, in its answer, admitted the sale of the oil to plaintiff as alleged, under the contract a copy of which was attached to the petition; that the oil was not prime crude, and that after its arrival at destination differences arose between the parties as to its quality and what allowance from the contract price for prime crude oil should be made in favor of plaintiff. It denied that the parties had ever agreed to submit the matter in controversy to the arbitration of the arbitration committee on cottonseed products of the Memphis Merchants Exchange; and alleged that "the same was not submitted in writing by the parties or their authorized agents."

When the case came on for trial, the defendant demurred to the petition, upon the ground that it appeared therefrom that the subject-matter of the award was more than $500, and the submission to arbitration was not in writing. Thereupon the plaintiff, with leave of the court and without objection, amended the copy of the alleged agreement for arbitration attached to the petition, by adding after the words, "Blakely Oil and Fertilizer Company, per," the words, "T. B. McDowell, S & T," and also by adding after these words the following: "The Proctor and Gamble Co., by J. M. Macdonald, W——." The defendant then amended its answer by alleging "that the alleged submission is not the act or deed of the defendant; that T. B. McDowell had no authority to submit to arbitration the matters and things in controversy on behalf of the defendant." This amendment was sworn to by D. W. James, who further deposed that he was the president of the Blakely Oil and Fertilizer Company.

Upon the trial, the plaintiff introduced the depositions of Harvey J. Morrison and the depositions of George H. Wacher, residents of Ivorydale, Ohio. Morrison deposed that during the year

1903 he was employed by the plaintiff company as superintendent of its oil refinery at Ivorydale, Ohio; and Wacher testified, that during that year he was employed by plaintiff at the same place, and that his duties were to draw samples of oil from the tanks. Each of them testified in reference to the drawing of samples of oil from the tanks containing the oil shipped by defendant to plaintiff, and sending such samples, by express, to N. S. Graves of Memphis, Tenn. It appeared upon the reading of Morrison's depositions that he had been asked: "Do you have an independent recollection of these two particular samples, or do you now depend for your testimony upon memorandum or other sources?" To which he replied: "No, I do not have an independent recollection of these two particular tanks, but can depend upon a memorandum made at the time the samples were drawn." From Wacher's deposition it appeared that he too had been asked this same question, and in reply thereto had said: "I answered from memorandum." In each instance, counsel for the defendant moved to rule out the testimony of the witness in reference to the samples of oil, because the answer to the above-quoted question "showed upon its face that the witness was not testifying from memory, but from memorandum, and that, testifying from memorandum, it did not appear that he made the memorandum himself, or at any time knew the memorandum to be correct." The court sustained this motion and ruled out the testimony objected to.

The plaintiff next introduced the depositions of N. S. Graves, who testified: "I am now the secretary of the Memphis Merchants Exchange, of Memphis, Tenn., and held the position of secretary during the year 1903. I have before me right now the agreement for arbitration between the Blakely Oil and Fertilizer Company, Blakely, Ga., and the Proctor and Gamble Company, Cincinnati, Ohio, on two tanks crude cottonseed oil, P and G tanks numbers 85 and 532. The agreement is dated April 27, 1903. I also have before me the arbitration committee's award. It is dated May 7, 1903, signed by J. Myers, Chairman, H. J. Parrish, H. C. Hoskins, F. W. Brode, and A. H. D. Perkins, who at that time constituted the arbitration committee, cottonseed products, of this exchange. The decision is attested by myself officially and the seal of the exchange stamped over my signature. The original papers relating to the arbitration proceedings . . are kept by

me as secretary of the exchange in the exchange files in the secretary's office. I have in my official custody the award of the arbitration committee. . . I received by express from the Proctor and Gamble Co. samples of oil marked P and G 85 and 532, Blakely, Ga., April 7th. Said samples were accompanied by an affidavit signed by George H. Wacher, as being the person who took said samples, and I now have said affidavit in my official custody. Mr. Felix Paquin was the official chemist of the Memphis Merchants Exchange on the dates of the agreement for arbitration and the award. The said Felix Paquin made analyses of the samples received from the Proctor and Gamble Co., marked P and G 85 and 532, Blakely, Ga., April 7th, and I now have in my official custody the original official reports of the said Felix Paquin, covering analyses of said samples. . . Under the rules of the exchange, I am not permitted to attach the original of any papers to my depositions. The rule which prohibits this is Sec. 4 of Rule 11, page 19, of the rules governing transactions in cottonseed products; a copy of which I hereto attach. I also attach true and correct copies of all of said original papers, certified to by me officially, which I have carefully compared with the originals, and will have the same properly identified as such by the commissioner." "At this point plaintiff offered in evidence the sworn copy of the 'agreement for arbitration' attached to the depositions of witness N. S. Graves, and identified by the commissioner, . . as a true copy." "Defendant's counsel then objected to the introduction of said copy agreement in evidence, on the ground that there had been no proof of a genuine original; admitting, however, at the same time that if a genuine original did exist in the official custody of witness N. S. Graves at Memphis, Tennessee, a sworn copy thereof would be the highest and best evidence of its contents, said original being beyond the jurisdiction of the courts of Georgia."

Pending this objection the plaintiff introduced T. B. McDowell as a witness, who testified: "I am secretary and treasurer of the Blakely Oil and Fertilizer Company, and was such on March 25, 1903. I do not remember signing an original agreement for arbitration like that you have there [the sworn copy attached to the depositions of witness N. S. Graves]. . I will not say that I did not, but I have no recollection of it. If I had the original paper be-

fore me, I could tell from the signature whether I signed it or
not, but I can not tell from that copy whether I signed a paper
exactly like that or not." The examination of the witness was then
suspended, and plaintiff introduced the original contract of pur-
chase between the parties, which was exactly like the copy attached
to the petition; and also certain letters and telegrams embracing
the correspondence between the parties, from which the following
appeared: On April 23, 1903, plaintiff telegraphed to defendant:
"Tank five thirty-two guaranteed basis prime here shows nine
half Ffa. Please agree Memphis arbitration determine allowance
due us." On the same date the plaintiff wrote to the defendant:
"Confirming our telegram of even date, P & G 532 arrived at
Ivorydale and the Oil tests F. F. A. 9.52. As this oil was bought
Basis Prime, we would ask that you kindly telegraph your agree-
ment to Memphis arbitration and have the committee determine
the allowance due us." On the same date the defendant tele-
graphed to the plaintiff: "Advise what is right and best you can do,
probably adjust without arbitration." On the next day, the plain-
tiff telegraphed: "Loss to us is ten cents per gallon." On the
same date the defendant telegraphed: "Not understand telegram,
at what price do you want us to bill oil?" On the same day
(April 24, 1903), the plaintiff wrote to the defendant: "We have
your telegram saying we can probably settle on your tank without
arbitration, and for us to let you know amount due. We have an-
swered . . that it will take 10c. per gallon to cover our loss.
The oil, you must remember, is very bad." The plaintiff also,
on this date, telegraphed: "Your oil only worth twenty-three and
half cents. This equal allowance ten cents gallon;" and, on the
same day, telegraphed: "Tank eighty-five received. Oil exactly
like tank five thirty-two. Equal allowance ten cents gallon. An-
swer quick. Holding both tanks loaded." Under the same date,
the plaintiff wrote to the defendant: "Confirming telegrams which
passed between us this afternoon will say, both your tanks have
now arrived at Ivorydale, . . and we figure that the oil is
worth to us only 23½ cents per gallon. . . We hope to have
your prompt reply as to whether you desire to make direct settle-
ment or prefer arbitration on these cars, as they are both being
held loaded at Ivorydale." On April 27, 1903, the plaintiff tele-
graphed: "Please telegraph agreeing allowance or arbitration.

Must unload tanks:" On the same day the defendant telegraphed: "Can not accept your offer twenty-three one half unreasonably low, delivery very similar oil thirty-one, will arbitrate Memphis, Julian Field will confer." On the same date the defendant wrote: "We beg to confirm our telegram of this date declining your offer of 23½ cents for two tanks oil now at Ivorydale, and advising that Mr. Julian Field, of Atlanta, would take matter up looking to Memphis arbitration. . . " On the same date the plaintiff wrote: "We have your telegram of to-day, saying that you will arbitrate with us the question of allowance on tanks 85 and 532, feeling that the figure we have named as an allowance, 10c. per gallon, is unreasonable. We are glad that you have decided to arbitrate, as this is very much more satisfactory to us. . . " On May 9, 1903, the plaintiff wrote to the defendant: "We are in receipt to-day of decision of the Memphis Merchants Exchange covering P & G 85 and 532, allowing us 13c. per gallon on each tank. We enclose herewith our bill for $1,732.38, for which we have to-day made sight draft on you." etc. On May 11, 1903, the plaintiff wrote to the defendant: "We enclose herewith invoice for $1,732.38, which we neglected to send you in our letter of last Saturday." On May 19, 1903, the defendant wrote a long letter to the plaintiff, which began as follows: "We are in receipt of a letter from Mr. Julian Field, in which he states that all efforts on his part to bring about what we term a reasonable settlement of the differences existing between us . . have been productive of no result, and he has referred the matter again to us." Then, without allusion to the subject of an award, followed matter in explanation and justification of the defendant's rejection of the offer which the plaintiff had made, to accept an allowance of ten cents per gallon; in the course of which occurred the statement: "We knew, of course, this oil was not prime, and we expected to pay you some allowance, but we expected it to be reasonable, so we would profit by this sale to you over the price we had before us, else we would have sold straight on sample and had a done thing of it." This letter concluded as follows: "We regret very much that these differences have come about, and particularly just as they have. We expected some relief from Memphis, but with these facts before us we can not, in justice to ourselves, accept your 'Account Quality' of $1,732.38." To this letter there

was a reply from the plaintiff, dated May 22, 1903, which is not material here.

After these letters and telegrams had been introduced and read in the hearing of the witness McDowell, he testified, that he wrote and signed the two letters from the defendant to the plaintiff (signed "Blakely Oil & Fertilizer Co., T. B. McDowell, Secretary and Treasurer"); that, "from seeing those two letters, [he] would say that [he] must have signed that agreement for arbitration, but [had] no recollection of signing it independent of those letters;" that his "best opinion," from those letters, was that he did sign it, but he could not recall it independently of them. After the introduction of this evidence, the court "sustained the motion of defendant's counsel and ruled out the copy agreement for arbitration, as offered by plaintiff." The bill of exceptions recites, that this ruling of the court "left the plaintiff where it was useless to proceed further;" and that it "thereupon declined to introduce any further evidence, and invoked a ruling of the court as to the disposition of the case;" which ruling the court declined to make, and allowed defendant, over the objection of plaintiff, to introduce the following evidence of D. W. James: "I am president of the Blakely Oil and Fertilizer Company, and neither myself nor the directors authorized T. B. McDowell or any one else to sign an agreement for arbitration with plaintiff." The trial judge certifies, that "Plaintiff made no motion to withdraw or nonsuit, but merely insisted that the court should dispose of the case, which the court refused to do, and allowed defendant to introduce testimony." The defendant moved the court to direct a verdict in its favor, which the court did; and the plaintiff sued out a bill of exceptions, assigning error upon this and each of the other rulings before mentioned.

*Crosland & Jones,* for plaintiff.

*Potlle & Glessner,* for defendant.

FISH, C. J. (After stating the facts.)

1. Counsel for the defendant in error raises a question of practice, by contending that "where plaintiff fails to make out a case, and defendant introduces testimony, and the court directs a verdict for defendant, the plaintiff, who has had an opportunity to dismiss or take a voluntary nonsuit, can not successfully complain of the direction of the verdict." This contention is not

sound. In this case the plaintiff had to prove a written submission to arbitration, before introducing the award, which was the basis of its suit, and when the court excluded from evidence the document by which plaintiff sought to show such submission to arbitration, a recovery by the plaintiff was rendered impossible. Plaintiff clearly had the right to have the ruling which dealt a death blow to its case reviewed and, if erroneous, overruled. It would have lost this right if it had voluntarily dismissed its case, or if (what would have been equivalent to the same thing) a nonsuit had been granted upon its own motion. In our practice there is no such thing as a voluntary nonsuit, with right of appeal. "Error will not lie to the decisions of the court below, where the party, subsequent to the decision, *voluntarily* dismisses his case." *Mott* v. *Hill,* 7 *Ga.* 79; *Dannelly* v. *Speer,* Ib. 227. "A writ of error does not lie from a voluntary nonsuit." *Kent* v. *Hunter,* 9 *Ga.* 207; *Jones* v. *Mobile & Girard Railroad,* 64 *Ga.* 446; U. S. *v.* Evans, 5 Cranch, 279; Evans *v.* Phillips, 4 Wheat. 73; Cossar *v.* Reed, 17 Q. B. 540. The ruling in the last-cited Georgia case was made notwithstanding the fact that the language of the nonsuit was as follows: "At this term of the court comes plaintiff and takes a nonsuit of said case without prejudice and with leave to except to any errors." The general rule is that "Where a judgment is consented to in the trial court by the party complaining, his writ of error will be dismissed." *Zorn* v. *Lamar,* 71 *Ga.* 81. See also *Killen* v. *Compton,* 60 *Ga.* 117.

If the plaintiff had dismissed its action, or voluntarily taken a nonsuit, all that it could afterwards have done toward the enforcement of the alleged award would have been to have brought the suit over again, taking the risk of again having its evidence ruled out and a judgment in its favor thus rendered impossible. While it could not sue out a writ of error until a final judgment was rendered against it in the trial court, it had the right to simply wait until such judgment was entered, and then bring the case here, assigning error both upon the judgment and the antecedent rulings which rendered it inevitable. So far as the right of plaintiff to sue out a writ of error was concerned, the result of allowing the defendant to introduce evidence and then directing a verdict in its favor was the same as if the court had ordered a nonsuit, when the plaintiff, under the ruling which was absolutely fatal

to its case, declined to proceed further. In either instance, a final judgment against the plaintiff would have been rendered, by order of the court, because there was no evidence upon which a verdict in the plaintiff's favor could be predicated, the absence of such evidence being due to a prior ruling of the court, which the plaintiff would have the right to have reviewed, in order that, if erroneous, it might be set aside and the plaintiff allowed, upon a subsequent trial, to present the excluded evidence. In *Oscanyan v. Arms Co.*, 103 U. S. 261, 264, where the trial court directed a verdict for the defendant, because the opening statement of counsel for plaintiff disclosed that the contract sued on was an illegal one and, therefore, void, Mr. Justice Field said: "Involuntary nonsuits not being allowed in the Federal courts, the course adopted was the proper proceeding. The difference in the two modes is rather a matter of form than of substance, except in the case of a nonsuit a new action may be brought, whereas in the case of a verdict the action is ended, unless a new trial be granted either upon motion or upon appeal."

There is no merit in the contention that the plaintiff could not except to the direction of the verdict for the defendant, because it did not offer to introduce the award in evidence. As, under the ruling excluding proof of the submission to arbitration, the plaintiff could not possibly recover, it would have been useless to proceed further. *Miller* v. *Speight*, 61 *Ga.* 460; *Vaughn* v. *Burton*, 113 *Ga.* 103. This case, upon its facts, is clearly distinguishable from *Thompson* v. *Etowah Iron Co.*, 91 *Ga.* 538, which is cited by counsel for defendant in error. There the direction of a verdict for the defendant did not follow the exclusion of evidence by which the plaintiff might have made out his case; but it came after the plaintiff, with fair and full opportunity to present his case to the jury, had shown that, with all his evidence in and none introduced by defendant, a legal recovery by him was impossible. Here a verdict was directed for the defendant after the court had excluded evidence offered by the plaintiff, without the introduction of which it could not possibly recover; and the plaintiff by dismissing its action, or voluntarily submitting to a nonsuit, would have lost the right to have the ruling which shut out its evidence reviewed and, if erroneous, overruled. In like manner, this case is distinguishable from *Seymour* v. *National Building & Loan As-*

*sociation,* 116 *Ga.* 285, where it was held that it was not erroneous to allow the defendant to withdraw its motion for a nonsuit, after the judge had orally announced that he would sustain it, and "then, as the evidence was such as to demand a finding for the defendant, there was no error in directing a verdict accordingly."

2. There was no error in excluding the testimony of Macdonald, nor in ruling out that of Wacher, as to samples of oil drawn from the two tanks of oil sold by the defendant to the plaintiff. Macdonald testified that he had no independent recollection of the matter, but could depend upon a memorandum made at the time the samples were drawn. He did not state that he testified from his memory, as refreshed by the memorandum, nor that he made the memorandum himself, nor that when the facts were fresh in his memory he knew the memorandum to be correct. Whether he had ever read this memorandum, when he had a distinct recollection of the facts to which it referred, and then knew, from such independent recollection, that it was correct, did not appear from his testimony. "A witness can not, without finally testifying from his recollection of the facts, swear from a written memorandum without showing that he made the memorandum or at some time knew it to be correct." *Lenney* v. *Finley,* 118 *Ga.* 427; and cit. Of course, under this rule, the testimony of Wacher was properly excluded, because when asked if he had an independent recollection of these two samples, or depended for his testimony upon memorandum or other sources, he merely replied: "I answered from memorandum."

3. We think the court erred in excluding from evidence the paper offered as a copy of the alleged agreement for arbitration. Of course, before this paper was admissible, the plaintiff had to show the existence of an original, and that such original was genuine, and also that such original was inaccessible to its diligence. The existence of an original of the copy offered in evidence and the further fact that it was in the official custody of N. S. Graves, secretary of the Memphis Merchants Exchange, at Memphis, Tennessee, were clearly proved. And the defendant admitted that if a genuine original did exist in the official custody of Graves, at Memphis, Tennessee, a sworn copy thereof would be the highest and best evidence, as the original was beyond the jurisdiction of the court. So the question was whether there was

sufficient proof of the genuineness of the original paper which was in the custody of Graves, at Memphis, to admit secondary evidence of its contents. To prove this original to be genuine, the plaintiff had to prove its execution by the defendant; which the defendant denied. And to prove its execution by the defendant, the plaintiff had to prove, not only that the paper had been executed in the name of the defendant, but also that the person who so executed it was authorized to do so. Plaintiff sought to establish both these facts by proof of circumstances from which they could be legitimately inferred. It appeared from the evidence that the original paper from which the document offered in evidence had been copied was unattested. Plaintiff did not have access to it, and so could not resort to proof of handwriting for the purpose of proving by whom the signature purporting to be the defendant's was made. It had to prove this fact, as well as the authority of such person to execute the instrument for the defendant, by circumstances, or abandon its case. We know of no sufficient reason why the execution of such a written instrument may not be proved by circumstantial evidence, when direct evidence of its execution is not attainable; nor why, when proof of the handwriting of the purported maker can not be resorted to, other circumstances may not be proved from which its execution by him may be legitimately deduced. In 2 Cowen & Hill's Notes to Phillips on Evidence, 421-2, it is said: "Where no direct testimony on the point of execution or former existence of an instrument appears to be attainable, the fact may be proved by circumstances." In Wells *v.* Iron Co., 48 N. H. 491, the court, in laying down rules for the introduction of secondary evidence of the contents of written instruments, said: "But when witnesses can not be produced, the admissions of the opposite party of the existence of such documents may be resorted to, and when that and all other direct evidence of the execution or former existence of such instruments is wanting, the fact may be proven by circumstances." To the same effect, see McLaurin *v.* Talbot, 2 Hill (S. C.) 525; Lessee of Allen *v.* Parish, 3 Hamm. (Ohio) 107. See, also, as bearing on the question under consideration, Sicard's Lessee *v.* Davis, 6 Peters (U. S.), 124; U. S. *v.* Sutter, 21 Howard (U. S.), 170. In the first of these Federal cases Chief Justice Marshall, in discussing the provisions of a Kentucky statute re-

specting conveyances, and after pointing out that in a suit between the parties to a deed "Proof of sealing and delivery would alone be required, and the acknowledgment of the fact by the party would be sufficient proof of it," said: "If the original deed remained in existence, proof of the handwriting, added to its being in possession of the grantee, would, it is presumed, be prima facie evidence that it was sealed and delivered. . . But the deed is lost, and positive proof of the handwriting is not to be expected or required; the grantee must depend on other proof." In the case last cited, Mr. Justice Campbell said: "We agree that the rule of law which requires the best evidence within the power or control of the party to be produced should not be relaxed, and that the court should be satisfied that the better evidence has not been wilfully destroyed nor voluntarily withheld. But the rule on the subject does not exact that the loss or destruction of the document of evidence should be proven beyond all possibility of a mistake. It only demands that a moral certainty should exist that the court has had every opportunity for examining and deciding the cause upon the best evidence within the power or ability of the litigant."

In our opinion, as already intimated, the circumstantial evidence relied on to show the existence of a genuine original of the copy agreement for arbitration was sufficient to authorize the introduction of such copy in evidence. Of course, the admission of this document in evidence would not preclude the defendant from contesting the existence of a genuine original agreement for arbitration, but this, like all other issues of fact arising in the case, would be for the determination of the jury upon the whole evidence before them. *Graham* v. *Campbell*, 56 *Ga.* 258. Let us consider the circumstances disclosed by the evidence tending to establish the plaintiff's contention as to the existence of a genuine written agreement for arbitration. In the trade between the parties it was agreed that any differences arising between them under the contract should be subject to arbitration by the Memphis Merchants Exchange; and this agreement on the part of the defendant was made for it by McDowell, its secretary and treasurer, who represented it in negotiating the trade. Of course, this stipulation in the contract did not have the effect of submitting the differences which subsequently arose between the buyer and the seller to the arbitration of the Memphis Merchants Exchange; but

giving both parties credit for good faith in entering into a con-
tract containing this stipulation, its presence therein is a circum-
stance pointing to probable arbitration by such exchange, in the
event of differences arising under the contract, which the parties
failed to settle among themselves. Differences did arise which the
parties failed to settle; and in the correspondence which ensued be-
tween them relative thereto, each referred to Memphis arbitration,
as if it were a matter understood between them, as a means of set-
tling such differences. And when this correspondence showed
that there was no likelihood of an agreement between the parties,
the defendant, in a telegram to the plaintiff, wherein it declined
the plaintiff's proposition for settlement, declared that it would
"arbitrate [at] Memphis;" and on the same day wrote to the
plaintiff a letter confirmatory of this telegram, and describing it
as one declining plaintiff's offer of settlement "and advising that
Mr. Julian Field, of Atlanta, would take the matter up looking to
Memphis arbitration." As this letter, which was simply confirm-
atory of the telegram and bore the same date, was written for and
in the name of the defendant by McDowell, its secretary and treas-
urer, the strong probability is that he sent the telegram also. Af-
ter the defendant had been informed of the result of the arbitra-
tion, it, still acting through McDowell, its secretary and treasurer,
wrote to the plaintiff another letter, wherein, after at considerable
length setting forth, explaining, and seeking to justify its conten-
tions, it made the significant statement and admission that it had
"expected some relief from Memphis." In view of what had gone
before, this must have meant that the defendant had expected some
relief from the Memphis arbitration. How it could have expected
some relief from Memphis arbitration, if it had never agreed with
the plaintiff to submit the questions at issue between them to such
arbitration, is difficult of comprehension.

The defendant acted through its agent, its secretary and treas-
urer, McDowell, in making the contract of sale and stipulating for
arbitration of any differences between the buyer and seller by the
Memphis Merchants Exchange; and subsequently, when such dif-
ferences did arise, continued to act through such agent, and through
him rejected plaintiff's proposition of settlement and promised to
arbitrate the matter at Memphis; and, after the arbitration, still
spoke through this same agent as its mouthpiece, declining to settle

in accordance with the award and expressing its disappointment at the outcome of the arbitration. Such, at least, are conclusions which may be fairly drawn from the evidence. McDowell, being still the secretary and treasurer of the defendant company, was placed upon the stand as a witness by the plaintiff, and although he testified that he had no recollection of ever having signed the defendant's name to an agreement for arbitration similar to the paper purporting to be a copy of such an agreement, he, upon the correspondence between the parties being read in his hearing and upon being shown the letters which he wrote for the defendant to the plaintiff, stated that although he had no independent recollection of signing the defendant's name to such agreement, he must, from these letters, have done so, and his best opinion was that he did. In view of these circumstances disclosed by the evidence, the judge erred in excluding the alleged copy agreement for arbitration.

4. While the plaintiff failed in its effort to prove that the samples of oil which it sent by express to N. S. Graves, at Memphis, Tennessee, to be used by the arbitrators as evidence upon which to base their award, were drawn from the two tanks containing the oil sold by the defendant to the plaintiff, this fact would not necessarily have prevented a recovery by the plaintiff. Assuming that the parties had really agreed in writing to submit the matter in controversy between them to arbitration, and that their agreement to do so was in the language of the excluded document, it follows that the evidence to be submitted to the arbitrators was to consist of samples of oil drawn by plaintiff from these two tanks and "marked P & G 85 and 532, Blakely, Ga., April 7th," and furnished by the plaintiff to the arbitrators. Upon proof of a legal submission to arbitration and an award in accordance therewith, all presumptions are in favor of the fairness and validity of the award, and of the performance by the arbitrators of their duties. Abbott's Trial Ev. Civ. Cas. (2d ed.) 575; 3 Cyc. 728. See, also, *Littleton* v. *Patton*, 112 *Ga.* 438 (3). If the defendant really agreed that the arbitrators should act on samples of oil submitted to them by the plaintiff, without providing for any evidence of the genuineness of the samples so furnished to be submitted to them, there may be some question whether it was incumbent on the arbitrators to require the plaintiff to submit such evidence; but there

can be no question of their competency to decide upon its sufficiency, if produced. If it was the duty of the arbitrators to require the plaintiff to submit such evidence to them, the presumption is that they did so. So, if the plaintiff proved the submission as alleged, and the award by the arbitrators appointed, as declared on, the presumption would arise that they had examined and tested samples of oil submitted to them by the plaintiff, and that they had before them satisfactory evidence that these samples were drawn from the tanks containing the oil sold by the defendant to the plaintiff. So all that plaintiff had to do to make out its case was to prove the written submission to arbitration as set forth by its petition, and the award which it alleged had been the result of such submission. Then, unless the defendant successfully impeached the award, a verdict and judgment in favor of the plaintiff would follow as a matter of course.

*Judgment reversed. All the Justices concur.*