EUGENE WEIGEL, Respondent, v. POWERS ELEVATOR COMPANY, Appellant.

(194 N. W. 113.)

**Appeal and error — theory below cannot be departed from for first time on appeal.**

1. This case was tried on the theory that the plaintiff had a lien in the nature of a chattel mortgage on the grain alleged to have been converted. This theory will not be departed from in this court, following Ugland v. Farmers' & M. State Bank, 23 N. D. 536.

**Trover and conversion — conversion defined.**

2. When property is taken subject to a lien, a conversion thereof does not take place until some affirmative act on the part of the defendant, like tortious detention thereof from the owner, or the party entitled to the possession thereof, or an exclusion or defiance of such party's rights, or the withholding of possession under a claim of title inconsistent with that of the plaintiff or owner. Conversion under the facts in this case, and the theory on which it was tried, took place at the time of the demand and refusal.

**Trover and conversion — evidence of grain market sufficient.**

3. For reasons stated in the opinion, it is *held* that at the time of the alleged conversion of the grain, there was a grain market, in the legal sense, at Killdeer, North Dakota.

**Evidence — individual sales of grain incompetent to establish market value unless shown made at market price at time and place of conversion.**

4. While individual sales sometimes are competent evidence of value, they are not competent to establish market value of wheat when there is an established market, like the wheat market in the cities and villages in North Dakota, without showing, by competent evidence, that such individual sales are in fact made at the prevailing market price of wheat at the time and place of the conversion.

**Witnesses — evidence of witness having no knowledge independent from memorandum held inadmissible.**

5. Where a witness, in testifying upon the question of the market value or the market price of different kinds of grain more than one year before, who has no independent recollection of such market price, has a copy of records kept in the office of the corporation in whose employ as a manager he was at the time such records were made, showing what price it paid for various kinds and grades of grain on the date of the alleged conversion, and when such witness is, after examining such copy, unable to testify that he has any independent recollection of the market price, and his recollection is not, in fact, refreshed by referring to such copy, no evidence being offered to show who made the copy, when it was made, or whether it was correct when made, it is *held* that the witness is, in fact, testifying from a copy of the records without proper foundation; that the use of the copy as a memorandum for the ostensible purpose of refreshing the recollection of the witness is improper, and the testimony should not have been received over proper objection.

**Witnesses — not necessary that memorandum to refresh recollection of witness shall be made by himself, or original, if witness can speak from own recollection.**

6. It is not required that a memorandum or writing, to be proper for the purpose of refreshing the recollection of a witness, shall have been made by the witness himself, or that it be an original writing, if the witness, after inspecting it, can speak from his own recollection, or otherwise guarantee the accuracy of the record or memorandum used.

**Vendor and purchaser — interpretation of land contract that vendee was to deliver to vendor one half of all the crops annually held correct.**

7. For reasons stated in the opinion, it is *held* that the interpretation of the contract, for the sale of the land on which the grain alleged to have been converted was raised, by the trial court, was correct, to the effect that it was incumbent upon the vendee thereunder to deliver to the vendor one half of all the crops annually.

**Trial — requested instruction properly denied where no foundation laid in pleadings for evidence thereof; proper instructions as to issues established by competent evidence should be given on request.**

8. Assuming, without deciding, that the colloquy between the court and counsel for the defendant at the close of the trial was a sufficient request for an instruction, it is *held* that such request was properly denied because no foundation was laid in the pleadings for evidence of a statutory seed lien which would be entitled to priority over the lien claimed by the plaintiff, following Citizens Nat. Bank v. Osborne-McMillan Elevator Co. 21 N. D. 335, p. 341. Under proper pleadings, evidence of the existence ·of such a statutory lien would be admissible to reduce damages, and in such a case, proper instructions, with reference thereto, should be given on request.

Opinion filed May 21, 1923.

Appeal and Error, 3 C. J. § 618 p. 718 n. 50; Evidence, 22 C. J. § 151 p. 188 n. 11; Trial, 38 Cyc. p. 1615 n. 19; p. 1703 n. 75; Trover and Conversion, 38 Cyc. p. 2018 n. 89; p. 2088 n. 32; Vendor and Purchaser, 39 Cyc. p. 1319 n. 60; Witnesses, 40 Cyc. p. 2459 n. 55; p. 2460 n. 56; p. 2458 n. 47.

In District Court, Morton County, *Berry, J.*

Action to recover the value of grain alleged to have been converted by defendant.

Reversed.

*J. N. McCarter,* and *E. T. Burke,* for appellant.

*S. P. Halpern* and *J. K. Murray,* for respondent.

JOHNSON, J. This is a conversion action. The plaintiff is engaged in the banking and the real estate business at Hebron; the defendant operates a public warehouse and elevator at Killdeer. The plaintiff seeks to recover damages from the defendant for the alleged conversion of a quantity of grain grown by one Frederick Spier, in 1920, upon certain lands situated in Dunn county. The grain, which the defendant is charged with converting, was delivered to it by Spier, at its elevator at Killdeer, North Dakota, sometime during the fall of 1920, and was the 1920 crop. It is conceded that the land on which the grain was raised had been sold by Eugene Herzog to Spier in 1918, under a contract for a deed, on the crop payment plan. The evidence also shows that in 1920 Herzog and Mr. and Mrs. Fred Spier executed a new contract covering the same premises as the old contract did, and in sub-

stantially the same terms. This contract, however, they dated back to 1918. The evidence further tends to show that the original contract was destroyed, and the new contract took its place. The contract was, on the 2nd day of September, 1920, assigned by Herzog to plaintiff and respondent, Weigel.

The contract contains the following stipulation with reference to the payment of the purchase price:

"Said party of the second part further agrees to pay the said party of the first part as and for the purchase price of said described premises the said sum of five thousand and two hundred dollars as down payment in form of equity in land and rest dollars according to the conditions of ten promissory notes for thirteen thousand no/100 dollars ($13,000), each due October 18, to 1928, and interest thereon at the rate of 6 per cent per annum, in gold or its equivalent, in manner following, to wit: 8 per cent after maturity. That he will deliver to said party of the first part or agent, one half of all crops raised each year at Killdeer or such other place as may hereafter be mutually agreed upon, such delivery to be made and the price of grain so delivered to be fixed on or before the first day of December of each year. The price so fixed to be the market price at the time of delivery of said grain; the amount so realized to be credited on this contract, first by paying the interest due at the time of said delivery, and the remainder to be applied to the reduction of the principal sum then remaining unpaid, until the full amount of the principal and interest is wholly paid."

The contract further stipulates that the title to all of the crop should be in the vendor until division, and delivery of one half thereof, to the vendee. This part of the contract is in the following language:

"It is further agreed and understood that no assignment of the premises or any part thereof, or of said contract, or any pledge thereof, shall be valid unless the consent of the said party of the first part shall be indorsed thereon or permanently attached thereto, and it is further hereby especially agreed by and between the parties hereto, that the title of all grains and crops grown and raised upon the above-described land during the entire life of this contract shall be and remain in the party of the first part, it be the express understanding that the first party reserves title to seed crops and that such title shall remain intact

in the party of the first part until after the proper division of said crops has been made."

There was a further stipulation in the contract that a chattel mortgage should be executed by the vendee to the vendor on all crops grown to secure the payment of the purchase price during the life of the contract. No chattel mortgage was ever executed or filed and the contract, itself, was not filed as a chattel mortgage nor was it filed for record in the office of the register of deeds of Dunn county. There is no claim of fraud against appellant, or that appellant purchased this grain with actual knowledge of plaintiff's alleged lien. It also appears that there was an unsatisfied seed lien against this grain which, under the statutes of this state, would be superior to that of a mortgage.

The jury returned a verdict for the plaintiff in the sum of $775.51, upon which judgment was entered.

At the conclusion of the plaintiff's case, the defendant moved for a directed verdict, which was resisted by the plaintiff, and this motion was renewed after both sides rested; both motions were denied. After the verdict was returned, the defendant and appellant moved for judgment notwithstanding the verdict upon the grounds set forth in the motion for a directed verdict. Inasmuch as there was not such a total failure on the part of the plaintiff to prove a cause of action as could not be remedied on a new trial, this motion was properly denied.

Thereafter the defendant and appellant moved for a new trial. This motion was denied. This case was tried upon the theory that the vendor in a contract for the sale of land on the crop payment plan, where the contract in terms reserved title to all of the grain raised on the premises until division of the crop each year, has a lien on such crop in the nature of a chattel mortgage and that a demand and refusal are necessary to constitute conversion. On the abstract question whether the vendor under such a contract has a lien on the crop or is the absolute owner thereof we express no opinion. We simply decide this case on the theory on which it was tried and assume that a demand and refusal are essential to plaintiff's right to recover in conversion in this action. Plaintiff below assumed that he had a lien on the crop. For the purpose of this decision we assume, without deciding, that this assumption was correct.

Appellant specifies thirty-three errors, most of which relate to rulings

of the trial court upon objections to certain evidence. This appeal, therefore, brings up for review numerous errors or law alleged to have occurred at the trial.

We believe that the decision of this court upon specifications 25, 26, 27, 28 and 29, is decisive of this case. The errors complained of in these specifications refer to the testimony of the witness, O. H. Larson, who was called by the plaintiff and respondent to establish the market price, or market value, of durum at Killdeer, on several dates, on one of which dates the conversion is alleged to have taken place.

Before considering these specifications, it will be necessary to a thorough understanding of the issues, to state the facts more fully. The plaintiff and respondent proved the execution of the contract hereinbefore referred to, the growing of the grain in issue by the vendee thereunder, and the delivery of a total of 1,000 bushels of wheat and durum and some 65 or 75 bushels of flax to the elevator of the respondent at Killdeer, sometime during the fall of 1920. The exact date of delivery does not appear, neither is there any evidence in the record tending to show the grade or quality of the wheat and the flax delivered, except that of the witness Spier, the vendee under the land contract, who testified that all his wheat and durum was No. 1. The trial court having assumed that the grain in this case was taken subject to a lien, a conversion thereof does not take place until some affirmative act on the part of the appellant, like tortious detention thereof from the owner of the party entitled to the possession thereof, or an exclusion or defiance of such party's right, or the withholding of possession under a claim of title inconsistent with that of the plaintiff, or owner. As no such act was proved until the demand and refusal, there was no proof of conversion in this case, prior to the 16th of January, 1921. Citizens Nat. Bank v. Osborne-McMillan Elevator Co. 21 N. D. 335, 131 N. W. 266; Bentler v. Brynjolfson, 38 N. D. 401, 165 N. W. 553; Merchants' State Bank v. Sawyer Farmers' Co-op. Asso. 47 N. D. 375, 14 A.L.R. 1353, 182 N. W. 263; Catlett v. Stokes, 21 S. D. 108, 110 N. W. 84; Skjerseth v. Woodworth Elevator Co. 35 N. D. 295, 160 N. W. 70; Towne v. St. Anthony & D. Elevator Co. 8 N. D. 200, 77 N. W. 608. The plaintiff and respondent, therefore, offered in evidence several letters and copies of letters, all of which were offered for the purpose of proving demand and refusal. The first letter, dated December 22,

1920, written by the plaintiff and respondent, plaintiff's exhibit 13, was directed to the appellant, at its office, at Killdeer. In this letter the respondent asks the appellant to tell him how much grain Mr. Spier has hauled to the elevator and then says: "For your information I wish to let you know that 650 bushels of grain out of his wheat crop according to his contract will have to be applied on the contract. So far he has only sent me storage tickets for about 200 bushels. Half of his flax crop will also have to be applied on the contract.

"Shall be greatly obliged for an early reply, and oblige," Then as a postscript this appears: "Spier has the right to sell the grain at any time he sees fit only the money will have to be sent to me."

Manifestly this is not a demand for the grain, or for the storage tickets.

Plaintiff next introduces exhibit 14, the reply of the appellant to exhibit 13, and which gives the information therein requested. There is no refusal, but simply an imparting of information. Plaintiff next introduces exhibit 15, his own letter, dated January 4th, addressed to the appellant, at its office in Minneapolis, advising appellant that he had notified the Killdeer office that Fred Spier was supposed to pay him 650 bushels according to his contract. There is no demand contained in this letter. The plaintiff next introduces exhibit 16, which is a letter from J. M. McCarter, attorney at law, Bismarck, North Dakota, to the plaintiff and respondent, and is an answer to respondent's exhibit 15. This letter neither refuses, nor agrees to deliver the wheat, or the storage tickets, but asks for information as a basis for consideration of the claim. Plaintiff next introduces exhibit 17, which is a letter dated January 14th, from Messrs. Halpern & Rigler, attorneys for the respondent to J. N. McCarter, attorney at law, Bismarck, North Dakota. In this letter, respondent's counsel gave Mr. McCarter information as to the description of the land, the terms of the contract, under which Spier cropped the land, and purchased the same from the assignor of the respondent, the number of bushels threshed by Spier, the number of bushels already delivered by Spier to the respondent, and the number of bushels of wheat delivered at the appellant's elevator at Killdeer. The letter then closes with the request that the writers may hear from Mr. McCarter, and expresses a willingness to give further information. Plaintiff next introduces exhibit 18, a letter from J. N.

McCarter, dated January 16th, 1921, written to Halpern & Rigler, attorneys for the plaintiff and respondent, in reply to exhibit 17, their letter of the 14th of January, 1921. In this letter, exhibit 18, the attorney for the defendant and appellant specifically refuses to comply with the suggestions of counsel in exhibit 17, to the effect that appellant should deliver to respondent the wheat or the storage tickets, and states expressly that such delivery will not be made. This is the first letter from appellant which can fairly be construed as a refusal to comply with the demand of the plaintiff and respondent and says among other things: "We will have to hold what we have," and "We will not be able to comply with your request as to handing over storage tickets to grain we have in storage at Killdeer, stored by Mr. Spier."

It is true that on October 14th, counsel for respondent wrote the attorney for the appellant, exhibit 19, repeating in substance the information given in exhibit 17, to wit: The letter dated January 14th, 1921, and asked what position the appellant took with reference to the grain. This letter was answered by the appellant, exhibit 20, on the 17th day of October, 1921, refusing to comply with the demand to deliver the storage tickets or the grain.

There are, therefore, in evidence, two distinct refusals by the appellant, one evidenced by exhibit 18, the letter of January 16th, and the other evidenced by exhibit 20, the letter of October 17, 1921. The conversion, therefore, took place on either of these dates. The view most favorable to the plaintiff and respondent is that the conversion took place on January 16th. No evidence of any kind was offered as to the market value of grain on October 17, 1921, but evidence was offered as to the market value on January 15th and 16th, 1921. Furthermore, the respondent, in his brief, apparently takes the view that the conversion took place on or about the 15th, or 16th of January, 1921, because on page 18 of the brief, counsel refer particularly to exhibits 14, 18 and 20 to show the demand and refusal. Exhibit 14 is not in any sense a refusal and cannot be construed as such. It furnishes information requested, and goes no further. Exhibits 18 and 20, however, are both unequivocal refusals to comply with the plaintiff's demand. For the purposes of this decision, therefore, we shall assume and so hold, that the conversion took place on the 16th of January, 1921. There is no evidence in the record from which the jury would be justified in finding

a conversion upon any other date, except that of October 17th, 1921. As already pointed out, October 17th must be eliminated because there was no evidence before the jury of the market value of the grain at Killdeer, on or about that date. We think, under the rule laid down, in First Nat. Bank v. Minneapolis & N. Elevator Co. 11 N. D. 280, 91 N. W. 436, the correspondence prior to the 16th of January, 1921, cannot be construed as a demand and a refusal, but that the appellant and respondent was fairly entitled to that period of time to investigate the claim of the plaintiff and respondent.

As heretofore stated, no evidence was offered at the trial, to establish the number of bushels of any grade, or quality, or the number of bushels each of wheat and of durum raised on the land described in the contract, and delivered at the appellant's elevator by Spier. The evidence tends to show that there is a difference in the market price between Marquis wheat and durum, and that frequently durum is lower in price than Marquis or other kinds of wheat. The court instructed the jury, in substance, that if the jury was unable, from the evidence, to determine the exact number of bushels of each kind of grain converted, if there was any conversion, and if the jury found different market values for different kinds of grain, that then, in that event, the plaintiff's recovery would be limited to the rate per bushel of the grain having the lowest market value at the time and place of conversion. The court then used the following language: "For example, if you find that durum wheat had a lower market value per bushel than Marquis wheat, then you should find the total number of bushels of wheat at the market price per bushel of durum wheat." To this instruction, no specific exception was taken. The court, in this instruction, told the jury, in effect, if it found for the plaintiff upon the question of conversion generally, in determining the market value of the grain converted, to use as a basis the market value of the grain, the value of which was the lowest on the date of the conversion. The evidence shows that durum on the 16th of January, 1921 was lower than No. 1 Marquis wheat on January 15th, and, therefore under this instruction of the court, the jury, in arriving at the amount of the verdict, must have multiplied the number of bushels converted, by the market value of durum on that date, at Killdeer, which was $1.47. Marquis was higher than durum on January 14th; on January 15th, durum was one cent lower; there is no testimony in the

record as to the market price of Marquis wheat or flax on January 16th, 1921, the date of the demand and refusal, though evidence on this point on this date was vitally important to establish plaintiff's cause of action.

The only witness that testified to the market value of durum at Killdeer on the 16th of January, 1921, was the witness, O. H. Larson. His testimony appears in the transcript at pages 85 to 91. All of his testimony is hereinafter set forth.

## Direct Examination.

My name is Ole H. Larson; I live at Killdeer, North Dakota; I am secretary and manager of the Killdeer Equity Elevator Company; I have been engaged in the buying of different kinds of grain for the last three years, at Killdeer. I am acquainted with the prices of different kinds of grain, of wheat, or the market price of the different kinds of wheat and grades of wheat, at Killdeer during the year 1920 and 1921; on December 22, 1920, the market price of durum No. 1 was $1.41; on December 23, 1920, the price was $1.41; on January 4, 1921, the price was $1.48; on the 5th of January, 1920 (witness probably means 1921), $1.45; on January 6, 1921, the price was $1.46; on January 7, 1921, the price was $1.46; on January 14, 1921, the price was $1.49; on January 15, $1.49; and on January 16, $1.47. The highest market price of No. 1 durum, at Killdeer, since the 22d day of December, 1920, is $1.49, and this was on the 14th and 15th of January, 1921.

## Cross-examination.

On this last question in so testifying that that was the price, I know that was the price from my records. I have a copy of my records here.

Q. Have you any independent knowledge of these facts without reference to your record?

A. I have. The only way you give your knowledge of anything you have to go by your records of what you paid.

I gained that knowledge from the records I made of what I paid. I know how the price of grain was on the different dates to which my attention has been called and to which I have testified just previous to that and just after that. The price was virtually higher or lower according

to the way the market went. If it was not for the record I have kept
pertaining to the different prices, and dates, that I have testified to, if
I did not have that record, I would not have any independent knowledge
of these prices, except just as I would know what happened to come to
my memory.

### Examination by the court.

Q. Were you buying wheat up there at that time?

A. Yes.

Q. And during the time you were buying you kept a record of the
prices *you were paying for durum wheat?*

A. Yes sir.

Q. In order to testify as to those prices you looked up the records
and refreshed your memory?

A. Yes.

### Cross-examination, Continued.

I do know those different prices without my books in regard to these
questions that have been asked. I know what the price was on the 15th
day of January, 1921, after going back to the records. If I had not
got these records I might not, just exactly, have been able to tell within
a few cents or so.

The fair import of the testimony of this witness, it seems to me, is
as follows:

First. Without the aid of records or memoranda, he was on January
23, 1922, the time of the trial, wholly unable to recall the price his
employer paid for durum on January 16th, 1921, at Killdeer, North
Dakota. That he possessed personal knowledge of this fact on January
16th, 1921, may be conceded, although on this point, the record is not
clear; that this fact had vanished from his memory so completely that
on January 23d, 1922, it could not be recalled without aid from ex-
trinsic sources, he himself admits.

Second. That the concern that employed him kept records which
showed the price paid by it for the different kinds and grades of grain
on January 16th, 1921, and other dates, and that from these records
he testified to the market price of durum on January 16th, 1921.

Third. That study of the records kept by him and an examination of the facts therein recorded, did not serve to *revive* a *faded* memory or to bring back to the surface of his mind facts which for sometime had been wholly submerged in forgetfulness, but in point of fact, the dates, amounts, kinds and grades of grain, concerning which testimony might be desired more than one year afterwards, had so completely faded from his memory, the lines of association that at one time may have bound these with associated or related facts had been so completely severed, that Mr. Larson was wholly dependent upon the records of his employer, and after examination thereof, was still unable to testify from any independent knowledge which was *revived,* rather than *re-created* (in the form of a conclusion based on the records) by such examination.

This testimony, we believe, was improperly received upon the question of market value. Objections made thereto should have been sustained or the motion to strike it out granted. It appears from the cross-examination of the witness—this was clearly brought out in the examination conducted by the court—that he bases his testimony as to market value at Killdeer on what *his employer paid* for durum on January 16, 1921.

The court instructed the jury that if they found for the plaintiff upon the claim of conversion, then recovery must be based on the "market value" of the grain at Killdeer on the date of the conversion. We do not believe that individual transactions of this sort, under the circumstances in this case, where a market exists in the legal sense, furnish a proper basis for proof of market value of wheat. The court may take judicial notice of the fact—one of common knowledge throughout the state—that the market prices of grain, particularly of wheat, in North Dakota, are determined by, and are but the reflex of prices paid for the same grades of grain at certain centers in the country, like Minneapolis, Minnesota, Chicago, Illinois, and other points, after taking into consideration the cost of transportation, insurance, handling charges, and the like. Grain buyers at points in North Dakota receive daily market reports, cards, or bulletins, showing the prices on the different kinds and grades of grain, which become the basis for prices at local points in this state. Upon the reports thus received, local market prices are fixed from day to day. There is a market, in the technical and legal

sense, for wheat at Killdeer, North Dakota, as there is in nearly every city and village in the state, situated upon a railroad. On the other hand, it is a matter of common knowledge that frequently one local dealer pays a "premium" on, a higher price than his competitors for wheat, or certain grades thereof, sometimes because of the assumed superior intrinsic value. For this, various other reasons may exist. Manifestly the price paid under such conditions by such a dealer would not represent or even be evidence of the market value at that place. It is true that individual sales may be and often are competent evidence of value, but when there is an established market, like the wheat market in the cities and villages of North Dakota, proof of what one of several competing dealers—the record shows at least three such dealers at Killdeer—paid for one kind of grain on a certain day is not alone proper and sufficient evidence of market value, without at least showing, by competent evidence, that such price was in fact the prevailing and current market price at the point. It was not even shown that the witness' employer paid this price to *all* who brought durum to his elevator on that day. Waldrop v. Goltzman, — Tex. Civ. App. —, 202 S. W. 335, 337. All Larson's testimony as to the market price of durum at Killdeer amounts to is this: "The records of the Killdeer Equity Elevator Company, by which I was employed as manager, showed that it paid *somebody,* for durum, on January 16, 1921, $1.47." It seems plain that this evidence is incompetent to establish market value. Houston Packing Co. v. Griffith, — Tex. Civ. App. —, 164 S. W. 431.

In Fahey v. Updike Elevator Co. 102 Neb. 249, 166 N. W. 622, the supreme court of Nebraska held that the testimony of a dealer as to individual sales or individual transactions should have been excluded as not the proper evidence to establish market value in face of the fact that market reports were available for the purpose. There is also in the case of Sisson v. Cleveland & T. R. Co. 14 Mich. 489, 90 Am. Dec. 254, a condemnation of evidence of individual transactions to establish market price in an opinion written by Justice Cooley. For a statement of the law as to when there is a market and definitions of "market value," see McGilvra v. Minneapolis, St. P. & S. Ste. M. R. Co. 35 N. D. 275, 287, 159 N. W. 854.

Not only was the testimony of the witness Larson incompetent upon the question of market value, but no legal foundation was laid for its

introduction for any purpose. The view we take of his testimony is that knowledge, assuming that he once possessed such knowledge personally, of prices paid by his employer on various dates for different kinds and grades of grain more than one year before, had so completely passed out of his mind that he had no independent recollection thereof, even after examining his employer's records. To permit him, as was apparently done in this case, to testify, in effect, from unverified copies of these records, violated well established rules of evidence.

It is well to bear in mind that the witness and his elevator had to deal with at least six different varieties of small grains, commonly raised and marketed in North Dakota; that some of these grains like wheat, for example, are graded on the basis of quality, into three or more different grades, and that the prices vary according to the grade; that the prices on different grains and grades of the same kind of grain fluctuated frequently on the same day, being sometimes lower in the afternoon than in the forenoon, and vice versa; that some three hundred and seventy days had elapsed between the date when the testimony was given and the time when the transactions took place. It seems to be perfectly clear that no normal memory would pretend to be able to carry such isolated and comparatively unrelated data for this length of time; nor would the examination of any records or data, in the case of the average person, serve to revive and render independent any recollection thereof.

The language of the court in the case of Russell, Burdsall & Ward v. Excelsior Stove & Mfg. Co. 120 Ill. App. 23, at pages 32 and 33, seems apt upon a state of facts similar to the facts in the case at bar. In speaking of the testimony of one Fisher, with reference to items of an account as shown by invoices, concerning which he had personal knowledge three years before, the court said:

"The judgment in this case must be reversed and the cause remanded, because the only evidence offered by appellee of the quantity and prices of bolts purchased by it from parties other than appellant, and upon which purchases appellee's claim for damages is based, consisted of invoices received by appellee from the various sellers. *True, the witness Fisher made a pretense of having an independent recollection of the different transactions involving the purchases of bolts, but an examination of the records makes it clear that his claim in that regard was mere pretense and that his testimony was based entirely upon a reading of the*

*invoices and not upon his personal knowledge or recollection of the transactions.* The transaction in question involved fifty or more separate invoices of bolts, purporting to show sales to appellee, from October 26, 1899, to December 23, 1900, the invoices in many instances containing several different items ranging in amount from a few cents to several hundred dollars, and it is incredible that the witness could have testified of his personal knowledge with respect to the same."

It is true in the case at bar that in response to a leading question, which probably called for a conclusion, the witness claimed that the examination of his records, or the copy thereof, "refreshed" his recollection. We think, however, that a reading of the record in the case makes it clear that the examination of the records of his employer and the copy thereof, did not revive his recollection in the legal sense, but constituted the basis, the scource of his knowledge exclusively. The fact that he found it necessary to make a copy of his records to bring with him to the trial, is itself some evidence that an examination of the records in his employer's office, did not serve to revive his recollection, so that he could depend upon the same unaided at the trial.

While the courts have permitted witnesses to use memoranda, nevertheless, great care has been exercised to prevent fraud or error. Phillip and Greenleaf have agreed upon the following classification of the cases, in which writings are permitted to be used for the purpose of assisting the memory of a witness: "(1) Where the writing is used only for the purpose of assisting the memory of the witness; (2) where the witness recollects having seen the writing before, and though he has now no independent recollection of the facts mentioned in it, yet he remembers that at the time he saw it, he knew the contents to be correct; (3) where the writing in question neither is recognized by the witness as one which he remembers to have seen nor awakens his memory to the recollection of anything contained in it; but, nevertheless, knowing the writing to be genuine, his mind is so convinced that he is on that ground enabled to swear positively as to the fact." Greenl. Ev., § 437; Phillipps, Ev., 3d ed., § 411; 5 Jones, Ev. § 875. In 1 Wigmore on Evidence the following rules are stated governing the use of memoranda by witnesses:

"Sec. 744. Past Recollection Must Have Been Written Down. Exception for Former Oral Identification. It is commonly assumed,

as a fundamental condition of using a past recollection, that the thing recollected must have been written down as recollected. The ensuing rules are all corollaries of this assumed axiom.

"Yet in theory this is not essential. The tenor of the fact recollected may conceivably be preserved without writing. In practice there is one situation which not only illustrates this theoretical possibility but also demonstrates the wisdom of recognizing it, as an exception to the general rule. That situation is the former oral identification of a person, name, place, or signature whose identity is now forgotten. The fact recollected being a simple one, it suffices if the witness now knows that he did once orally verify it, even if he did not then preserve in writing the circumstance. The typical illustration is that of the identification of an accused person at the time of arrest:

"Sec. 745. (1) Recollection Must Have Been Fairly Fresh when Recorded. In order that the past recollection may be one worth trusting, it must have been sufficiently fresh and vivid to be probably accurate. When a present recollection is used, it may be sufficient (as noticed ante, § 726) to admit an 'impression,' or a 'belief': the witness tries to give 'the best of his recollection,' and the tribunal may well take what it can get, and not exclude it for want of more that is unattainable. But where the witness goes back to a past recollection, which can less easily be tested by cross-examination, he may properly be asked for something more decided,—something of a quality satisfactory in itself and not merely the best available. This quality the law has attempted to define, and even to test by an arbitrary rule. There is found, *first,* a general principle that the recollection, when recorded, should have been *fairly fresh,*—each instance being dealt with on its own circumstances; and, secondly, there is, more commonly, an arbitrary test defining the recollection as one recorded at or *near the time* of the events.

"(1) That the first is the preferable form for the law need hardly be argued; it exemplifies the excellent policy of leaving the law flexible and rational and not chilling it into rules more or less arbitrary:

"(2) But the common, though less proper, rule is that the recollection recorded must have been 'at or near the time' of the events in question. This phrasing has been generally used, even where it was not required for the decision of the case. Two things must be noted, however, about this rule: (a) The recollection must in fact have been fresh (i. e. ade-

quate), even though noted 'near the time,' (b) the phrases 'near the time' or 'shortly afterwards' really furnish no accurate test, and in their application the probable freshness of the recollection must after all be the ultimate test. It may be added that in some rulings the language mentions both the first and the second tests in the alternative. In most rulings, the decision turns upon the circumstances of the particular case.

"Sec. 746.　(2) Accuracy of Record; General Principle. It has already been noted (ante, § 734) that, so far as adequacy of Recollection is concerned, it is enough to require that at the time of making the record the Recollection should have been fresh, i. e. the event recent. But, having gained this assurance that the Recollection was adequate, it remains still for the law to make sure of certain other things which (in strictness) depend on the element of correct narration or communication (post, § 766). In the first place, it must make sure that this recollection was accurately represented in the record or memorandum then made; here several situations present themselves for solution. Next, it must make sure that the statement now offered as testimony by the witness is in fact identical in tenor with the record or memorandum formerly made; here, again, several different situations arise. Finally, it has to consider the testimonial status of the record when thus used.

"For the first of these steps—that of making sure that the record or memorandum, when made, represented the Recollection of the time with fair accuracy,—the requirements of principle may be summed up thus: (a) The witness must be able now to guarantee that the record accurately represented his knowledge and recollection at the time of making. (b) But, this testimonial guaranty of accuracy being all that is needed, it will therefore be generally immaterial that the witness was not the person actually writing or printing the record, provided the witness can give this guarantee; (c) except that in particular instances the circumstance that another person had prepared the record may justify the Court in doubting the witness' guaranty and rejecting the record. These various details may now be examined.

"Sec. 747.　Same: (a) Witness must Guarantee Accuracy. The witness must be able now to guarantee that the record accurately represented his knowledge and recollection at the time. The usual phrase requires the witness to affirm that he 'knew it to be true at the time.'

It is obvious that the witness' readiness to affirm this may rest on one of two reasons:·(1) He may distinctly recollect his state of mind at the time of making or first seeing the record and may thus now remember that he then passed judgment upon and knew the record's accuracy. Or (2) he may now actually recollect nothing of the occasion of making the record and of his then state of mind; nevertheless he may know, from his general practice of making such records, or from other indications on the paper, that he *must have passed judgment upon and known* the correctness of the record; here he none the less knows that he did know the record to be correct, although he has no present recollection of the specific state of mind.

"(1) As to the former of these two ways of verifying the record, no difficulty arises. If the witness can say, 'I distinctly remember that when I made or saw this memorandum, about the time of the events, I was then conscious of its correctness, his verification is satisfactory. (2) But if he relies, not on a present recollection of his past state of mind, but on other indications, such a habit, a course of business, a check-mark on the margin, or merely the genuineness of his handwriting, then the certainty is of a lower quality, though still satisfactory for most practical purposes. In general, it is conceded that when the witness' certainty rests on his usual *habit or course* of *business* in making memoranda or records, it is sufficient. Other peculiar circumstances, specially intended or calculated to indicate correctness, may be satisfactory. It is enough that the witness (as is usual with *attesting witnesses* to a *document*) · merely recognizes his handwriting and knows that he would not have written or signed without believing the record to be correct? Here the witness is really calling to his aid, not his specific business custom, but his general moral attitude; but, as a rule, the indication should be and is treated as sufficient.

"It is possibly the rule in Massachusetts that only *regular entries*, not mere casual memoranda, can be used,—apparently on the motion that this regularity is the only satisfactory guarantee of correctness. But this limitation is absolutely without ground, either of principle or of policy.

"It may be added that the witness must of course have had personal knowledge of the facts (ante, § 657) in the first instance; he cannot

guarantee the correctness of the paper as a record of facts which he himself never observed."

We do not believe that the testimony of the witness, Larson, is admissible under any of the rules stated by the authorities. The writing was used for a purpose other than merely assisting the memory. The witness was entirely dependent upon records and upon the copy. It would be sheerest pretense to claim that his recollection was revived and refreshed so that he could testify as to an independent fact from a recollection thus refreshed as to the prices paid for some one grade and kind of wheat more than one year before. The writing was a copy, the records were not in court, and no testimony was offered to show that at the time the copy was made, it was correct, or the contents thereof true.

In the case of Caldwell v. Bowen, 80 Mich. 382, 45 N. W. 185, a witness had been permitted by the trial court to testify from a copy of a statement which was material in the case. The question was asked:

"Do you remember what the statement made by Mr. Adams was?

A. I have a copy of it and will swear that he made it to me and I remember distinctly going to his store and getting the statement.

Q. Can you refer to the copy and refresh your recollection in such a way as to remember what the statement was?

A. I can't remember the figures, but I remember going to the store.

Q. By refreshing your memory from the statement, can you say what the figures were and what the result of this statement was?

By the court. If you have any paper or memoranda from which you can refresh your recollection as to what the statement was?

A. In my hand I have a copy of it—a copy of the statement made by him to me.

Q. Refresh your recollection. Can you state what the statement was?

A. Yes, by reading it, yes sir.

Q. What was his statement?"

The witness gave the same statement of which he had a copy. The court held that it was improper to permit the witness to testify from this statement in this way. As in the case at bar, counsel moved to strike out the testimony, which the court refused to do. The supreme court held in that case, that the copy was hearsay and that inasmuch as

the witness was unable, after reading the copy, to testify from an independent recollection, it was improper to permit the witness to read the copy. In a concurring opinion, Mr. Justice Grant says:

"If the witness had produced the original statement and had sworn that he took down correctly at the time what Adams had told him, but that he could not remember it and could only tell it by reading the statement, I think the statement would have been admissible. In such case, unless the statement can be admitted or the witness allowed to read it, the testimony must be excluded, because the witness has no independent recollection of what has been said. If at the time a statement is made, particularly where it involves figures, a person makes a memorandum of those figures, he could hardly be entitled to credence if he should swear that he recollected the figures independently of the memorandum. The rule that he may examine the memorandum and then must swear that he had a recollection of the facts, independent of the memorandum, before he can testify to them, is not, in my judgment, founded upon reason or sound policy. To exclude the statement is to exclude the most reliable evidence and results either in excluding the evidence altogether or in placing it before the jury in such a way as to weaken, if not destroy its value." Territory v. Harwood, 15 N. M. 424, 29 L.R.A.(N.S.) 504, 110 Pac. 556.

Before a witness is permitted to use a copy of a memorandum or of records, he should be clear and explicit in his evidence that the copy is a true transcript from the original, and that the original was correctly made and was true when made. There is no such testimony in this case. The witness Larson does not state that the original record was correct when made, or that the copy was correct. Chicago & A. R. Co. v. Adler, 56 Ill. 344, 348; Calloway v. Varner, 77 Ala. 541, 54 Am. Rep. 79; Proctor & G. Co. v. Blakely Oil & Fertilizer Co. 128 Ga. 606, 57 S. E. 879.

In Proctor & G. Co. v. Blakely Oil & Fertilizer Co. supra, the facts are almost parallel with the facts in the case at bar. In that case the witness was asked the following question:

"Do you have an independent recollection of those two particular samples, or do you now depend for your testimony upon memoranda or other sources?

A. No, I do not have an independent recollection of these two particular tanks, but can depend upon a memorandum made at the time the samples were drawn." -

In holding that the testimony was properly excluded, the court says at p. 617 of 128 Ga. at p. 883 of 57 S. E.: "Macdonald testified that he had no independent recollection of the matter, but could depend upon a memorandum made at the time the samples were drawn. He did not state that he testified from his memory as refreshed by the memorandum, or that he made the memorandum himself, or that when the facts were fresh in his memory he knew the memorandum to be correct."

In Diamond Glue Co. v. Wietzychowski, 227 Ill. 338, 81 N. E. 392, the supreme court of Illinois reversed the trial court upon the ground, among others, that a witness at the trial was permitted improperly to use a memorandum. The testimony of the witness was, on direct examination, that after having read the memorandum he remembered the condition of the elevator as described therein. On cross-examination, however, he admitted that he had no independent recollection of the facts even after reading the memorandum. The court held, that the witness improperly testified for the reason, among others, that there was no evidence offered to show that the memorandum was a correct and accurate record of what he had found on his inspection of the premises, nor was there any evidence that the memorandum correctly represented the condition of the elevator or its appliances at the time of the inspection. The court calls attention to the fact that the mere conclusion of a witness as to the existence of a fact derived from a consideration of other facts, like an examination of a written document, ought not to be permitted to go to the jury. It is a strong temptation for a witness, upon examining a paper with facts and figures thereon, to testify in some cases honestly and in other cases, dishonestly, that an independent recollection arises after such examination, when in point of fact the witness merely concludes that the facts must be true simply because they are recorded in the memorandum or record before him.

The court committed prejudicial error in permitting this evidence to go to the jury upon the question of market value. This testimony was incompetent under § 7909 of the Compiled Laws of 1913, and is objectionable upon substantially the same grounds as are set forth in

the opinion of this court in the case of Dr. R. D. Eaton Chemical Co. v. Doherty, 31 N. D. 175, 153 N. W. 966. The witness testified in substance that the memorandum which he had did not refresh his recollection so as to enable him to have any independent recollection of the facts testified to. The witness does not testify that the facts in the memorandum are correct. If the memorandum in this case was not made by the witness himself, any testimony based thereon would be hearsay and incompetent. It does not appear who made the memorandum. In short, the witness admitted a complete absence of personal recollection of the market price of grain at Killdeer upon the dates mentioned, and at the same time failed to state that the memorandum he used was prepared by himself, or under his direction, nor was he connected with such memorandum, in such a way, as to make the memorandum itself competent to establish market value within any of the rules stated by Wigmore, Greenleaf or Phillipps, supra. It is true, that it is not necessary that the memorandum, or the writing, to be proper for the purpose of refreshing the recollection, must have been made by the witness himself, or even that it be an original writing, *if the witness, after inspecting it, can speak from his own recollection,* or otherwise guarantee the accuracy of the record. 1 Wigmore, Ev. § 748.

It does not appear in this case that the memorandum was made contemporaneously with the facts concerning which the witness testified. Indeed, it appears from his own testimony that such memorandum was not made contemporaneously with the occurrence of the facts, but that it is merely a copy of the records made at the time when the information was received in his employer's office at Killdeer, with respect to the prices *it paid for durum on the dates given.* Neither judge nor jury saw these records. Larson's testimony was accepted as evidence of what these records showed. The originals should have been produced or their absence accounted for. 1 Wigmore, Ev. § 749. We believe it would be a dangerous innovation upon well established and salutary rules of evidence to permit a witness to testify exclusively from a memorandum made under the circumstances in this case. It involved no hardship to require the witness in question to produce the original price cards, or records, and to testify therefrom, and if required, and after a proper foundation, to offer the same in evidence at the trial.

Counsel also allege error in admitting copies of certain correspond-

ence, based on the contention that notice to produce the originals was not timely given appellants. Under the facts in this case, the reasonableness of the notice was a matter that rested in the discretion of the trial court and we conclude that there was no prejudicial error in the manner of its exercise. 22 C. J. 1064, 1065 and notes.

While the decision of this court upon specifications 25 to 29, inclusive, disposes of this appeal, we have examined the other alleged errors complained of. The errors alleged to have been committed in specifications 1 to 4, inclusive, are based upon the claim of the appellant that the crop contract did not require the vendee to deliver one half of the crop raised each year prior to 1921, and that under the contract, the vendee, Spier, was under no obligation to deliver one half of the crop of 1920. It is claimed that the plaintiff's share of the crop of 1920 was converted. The trial court construed the contract to require the vendee to deliver one half of any and all crops raised during the life of the contract, including, therefore, crops raised during 1920, and prior years. This interpretation of the trial court was clearly correct, and indeed the plain terms of the contract refute the contention of appellant's counsel.

Immediately after the court had delivered its instructions to the jury, the following colloquy between the court and counsel took place:

"Mr. Burke: Will you instruct the jury on the effect of the seed lien in case it is not satisfied?

Mr. Murray: We object to the court giving any instructions in that as it is not pleaded or set up as a defense.

The court: I will deny the request.

Mr. Burke: Exception."

Upon the foregoing, the thirty-second specification of error is predicated. In our opinion this ruling was not error. Assuming without deciding that the foregoing constituted a sufficient request for an instruction, we think, that in the first place, proof of the existence of the seed lien would not necessarily defeat the action; in a proper case its effect at most would be to mitigate damages. In the second place, and this is fatal to appellant's contention, no foundation was laid for this evidence or such instructions in the pleadings. Citizens Nat. Bank v. Osborne McMillan Elevator Co. 21 N. D. 335, 131 N. W. 266.

It is apparent upon the record in this case that the parties received a fair trial upon the issues therein, excepting the question of market value. We are, therefore, agreed that the new trial should be limited solely to the question of value of the grain converted. 4 C. J. 1194, 1195.

The judgment appealed from is reversed and remanded with directions to retry the issue of value in accordance with the views herein expressed. The appellant will recover the costs of this appeal.

CHRISTIANSON, BIRDZELL, and NUESSLE, JJ., concur.

BRONSON, Ch. J., concurs in result.