18  573
e130  166

No. 84.—Edward J. Dawson, plaintiff in error, *vs.* James Callaway, defendant in error.

1.] The execution of a commission to take testimony, was, in all respects, regular, except that it lacked the words, " answered, subscribed and sworn to before us," just above the place where the commissioners signed their names. The depositions were, in fact, signed by the witness. The commission thus executed, lay in office for more than three years. During the trial, the defendant objected to the execution of the commission, because the return lacked the words aforesaid. The Court ruled out the testimony: *Held*, that the Court, instead of ruling out the testimony, should have required the defendant either to waive the objection or submit to a general continuance of the case.

[2.] The opinions of a witness do not, in general, amount to evidence.

[3.] A witness swore, in reference to the execution of a bill of sale, as follows : "I did sign the said bill of sale as an attesting witness ; I saw said Jesse Coe execute said bill of sale, to said Susannah Watts, (as I supposed) for the purposes therein mentioned :" *Held*, that this was enough to make the bill of sale admissible to the Jury.

[4.] [5.] Declarations accompanying possession and explanatory of it, are admissible as evidence for the declarant and those claiming under him.

[6.] [7 ] A deceased person is represented, by his executor, *de son tort ;* and also, by that executor's executor, *de son tort*—so that if the relationship of the deceased person to another, is such that the Statute of Limitations will not run in his favor, theirs is such that it will not run in their favor.

[8.] The Statute of Limitations can be pleaded by those in whose favor it operates, and by those claiming under them, and by no others.

[9.] If one side examines a witness, though only on a single point, the other has the right to cross-examine him on every point.

Trover, in Meriwether Superior Court. Tried before Judge BULL, February Term, 1855.

This was an action of trover, brought by Edward J. Dawson against James Callaway, for the recovery of four negroes —Patsey and her three children.

The defendant pleaded the general issue and Statute of Limitations.

On the trial, the plaintiff proposed to read the evidence of David Dawson, taken by commission. The interrogatories were filed in Court, in August, 1851, and the trial was had in February, 1855. No objection having been filed, the defendant objected to the evidence, because the commissioners did not, at the foot of the answers of the witness, say : " Answered, subscribed and sworn to before us." The usual certificate preceded the answers, in which it was stated that the witness " had answered, after being duly sworn," &c. The Court sustained the objection, and plaintiff excepted.

The facts of this case, as appeared from the evidence, were as follows : On the 17th of March, 1815, Jesse Coe executed a bill of sale to Susannah Watts, for a negro girl, Charity, (the mother of Patsey,) the consideration being $375.

At the time, Susannah Watts and her brother John Watts, and Milly Watts, were living together, and continued to do so, and exercise acts of ownership over the negro girl, Charity, until, according to the statement of one witness, the year 1821, and according to another witness, until the year 1827. The Watts' family then separated, and the negro, Charity, was left in the possession of John Watts. In 1839, John Watts died in the County of Meriwether, in possession of the negroes. There was no administration upon his estate. The negroes went into the possession of his widow, who kept them until 1845, when she died, and the negroes went into the possession of her daughter, the wife of the defendant, who had them in possession at the time of their intermarriage. Mrs. Callaway was of age at the time of the death of her mother.

The plaintiff then read the evidence of George Watts, to prove the execution of the bill of sale from Jesse Coe to Susannah Watts, as follows : " I did sign the said bill of sale, as an at-

testing witness. I saw Jesse Coe execute said bill of sale to Susannah Watts, (as I supposed,) for the purposes therein mentioned."

To the cross-interrogatories, the witness stated—" my reasons about the purchase money is this : I believe John Watts counted the money down, (for Charity)—don't know whose money it was, nor do I know when carried to the place. It was and is my opinion, that if Susannah Watts had the money, she must have got it from John Watts."

To which plaintiff objected ; the Court over-ruled the objection and plaintiff excepted.

Plaintiff then proposed to read in evidence the bill of sale, to which defendant objected, " because the witness did not say he was present at the time of its execution, and did not say he saw it signed, sealed and delivered ; and that the name of George Watts plainly appeared to be signed with different ink from that of the other witnesses."

The Court sustained the objection, and plaintiff excepted.

Plaintiff then proposed to read in evidence so much of the depositions taken by the defendant for the same witness, as showed that he was present at the execution of the bill of sale. The defendant insisted that plaintiff could not read a portion without reading all of the answers of the witness. The Court so ruled, and plaintiff excepted.

Plaintiff then proceeded to read said depositions—objecting to the following portions, in which the witness stated : " I do not know, but think John Watts counted the money to Coe, for the negro Charity. I was acquainted with the means and circumstances of Susannah Watts at that time. If she had the means to buy negroes, I think she obtained it through John Watts." " John Watts had the means to buy negroes, unless he had previously transferred them to Susannah Watts. I know of no other reason to induce John Watts to have the bill of sale for Charity made to Susannah Watts, than that he feared he might be involved by his wife, who had left him. I do not know, positively, but *think* that John Watts had paid over the amount of the purchase money for the negroes."

The plaintiff objected to this portion of the evidence, as above stated. The Court over-ruled the objection, and plaintiff excepted.

Plaintiff then read in evidence the depositions of Benjamin and Milly Dawson—the following portions of which were objected to by the defendant and ruled out by the Court, and plaintiff excepted : " After the negro was brought home, Susannah Watts claimed the negro." " During their stay in Hall, Susannah Watts made a deed of gift of Charity to John Watts' oldest daughter, Susannah." . " Susannah Watts heard, in the Spring of 1849, that John Watts was dead, and his family in Meriwether County." " He (Benj..Dawson) wrote letters, at various times, to people in Hall and Jasper Counties, to know where John Watts had gone, but never heard any thing from him." He further says : "in the Spring of 1849, Thomas Bloodworth, brother-in-law of his, wrote him from Columbus, or near there, that John Watts had returned to Georgia, and his family and the negroes were in Meriwether County ;" and this was the first time Susannah Watts had heard of him since he left Hall. This latter portion, not in brackets, was not objected to.

Plaintiff then read in evidence a deed of gift from Susannah Watts to the plaintiff, for the negroes, Patsey and her children, dated on the 25th day of July, 1849.

Plaintiff then introduced the defendant, to prove the existence and value of a child, born since the commencement of the suit, which he did.

Defendant's Counsel then proposed to examine the defence on the merits of the case not touched upon by the direct examination. Plaintiff objected. The Court over-ruled the objection, and plaintiff excepted.

The Court charged the Jury as follows :

That no administration on the estate of John Watts or his widow, was shown ; the possession of John Watts and his widow, and afterwards of his daughter, were seperate and independent possessions. That, therefore, if John Watts

Dawson vs. Callaway.

was the bailee of Susannah Watts, though the Statute of Limitations did not begin to run in his favor until he proved knowledge of the conversion to Susannah Watts; or if he had fraudulently concealed the property, the Statute could not run until a discovery of the fraud ; yet, that these rules did not apply to the possession of his widow—that her possession being a separate one, could not be affected by his fraud, or bailment, or contract; and that if the Jury should believe that the widow of John Watts held the property adversely, four years after the death of John Watts, using it as her own, and converting it to her use, then she had a good title to it, unless she had fraudulently concealed it from Susannah Watts; and this defendant could plead this outstanding title by the Statute in Mrs. Watts, in bar of this action, though he might not claim under her, nor tack her possession to his to create a bar by the Statute of Limitations. And to this charge plaintiff excepts.

Further—that the possession of Miss Watts was *separate* from that of her father and mother; and she would not be affected by the character of their possessions or their frauds. And that though she held the property as a trespasser, yet, that on her marriage with defendant, her possession became his possession—that their possessions were one; and if more than four years had elapsed from the commencement of the possession of Miss Watts to the bringing of the suit, that the plaintiff was barred and they must find for the defendant. And to this charge plaintiff excepts.

The plaintiff's Counsel asked the Court, in writing, to charge the Jury, "that if the possession of defendant is a possession *through* John Watts, or *under* him, he is in no better condition that John Watts." The Court refused, absolutely, to give this charge, remarking, "there was not a scintilla of evidence to support it; that there was no evidence that defendant received the property by descent;" and to this refusal plaintiff excepts.

The plaintiff's Counsel asked the Court, in writing, to charge

the Jury, "That possession, to mature a title under the Stat-ute of Limitations, must be adverse and continuous, and continuously adverse ; and that if the possessions of Mrs. Watts and Miss Watts, and defendant, are *separate* possessions, the·defendant can claim no benefit from any possession prior to·his own." The Court gave this charge with a qualification, to-wit: that if Mrs. Watts held the property more than four years, and had a statutory title, the·defendant could plead it in bar of this action, though he did not claim under Mrs.·Watts. And to this refusal and qualification, the plaintiff excepts.

B. H. HILL, for plaintiff in error.

DOUGHERTY; WARNER ; MOORE; HALL, for defendant...

*By the Court.*—BENNING, J. delivering the opinion.

It appears, upon the face of the return of the commission-ers to examine David Dawson, that David Dawson *signed* the depositions returned.

It is very doubtful, therefore, whether enough does not appear upon the face of that return·to show the commission to have been well executed—very doubtful whether enough does not appear upon the face of the return, to show that the depositions were, in fact, " answered, subscribed and sworn to" before the commissioners, by the witness. I, myself, am·very much disposed to think that there does appear enough to show that.

And then, the interrogatories had lain in office for more·than three years. And the 47th rule of Court requires all objections to the execution and return of interrogatories, on appeal trials, to be made before the cause has been submitted·to the Jury. The case was on·-the appeal. The plaintiff's·continuances were exhausted.

[1.] We think the most the Court could have done on this objection to the execution of the commission, would have been.

to present to the defendant the alternative, either to waive the objection or submit to a general continuance of the case.

Several parts of the answers of George Watts consisted in mere matter of opinion; and therefore, should not have been read to the Jury, against the objection of the plaintiff. These parts are as follows: 1. A part of Watt's answer to the first cross-question in the plaintiff's set of interrogatories for him, in the following words: "it was and is my opinion, that if Susannah Watts had the money, she must have got it from John Watts." 2. A part of Watts' answer to the second direct interrogatory in the defendant's set of interrogatories for him, in the following words: "I do not know, but think John Watts counted the money to Coe for all the negroes." "If she had the means to buy negroes, I think she obtained it through John Watts." 3. A part of his answer to the first cross-interrogatory of this same set, in the following words: "I have already stated, in 2d interrogatory, that John Watts counted the money to Coe—I think, I cannot say, positively, it was John Watts' money. If Susannah Watts had the means, I think it came through John Watts." "I do not know, positively, but *think* that John Watts had and paid over the amount of the purchase money for the negroes."

[2.] As it appears to us, the witness intends, by these answers, to give nothing but his opinions. If so, the answers were, of course, not proper to go to the Jury.

George Watts, as to the execution of the bill of sale, swore, in answer to the plaintiff's interrogatories, as follows: "I did sign the said bill of sale, as an attesting witness. I saw said Jesse Coe execute said bill of sale to said Susannah Watts, (as I supposed,) for the purposes therein mentioned." This, the Court held, did not prove the bill of sale sufficiently to make it admissible to the Jury. But we think it did. If this statement be true, the most obvious, if not the necessary inference from it is, that the witness saw the bill of sale signed and delivered; that he was present when that was done, and that he attested the doing of it. A statement from which

such an inference may be drawn, is certainly sufficient to carry the instrument to which it relates to the Jury.

Any objection to the word "execute," on the score that it expresses a conclusion rather than a fact, would equally lie to any one of the words, sign, seal, deliver.

It appears, that at the time when the slave, Charity, was purchased, and for a while afterwards, Susannah Watts and John Watts lived together.

[4.] And thus living together, *prima facie*, by presumption of law, they were in the joint possession of the slave. Any declaration of either, made while they were so living together, explanatory of the nature of the possession, would therefore be admissible as evidence, for the one which made it, under the principle of the *res gestæ*. (1 *Greenlf. Ev.* §108, *and cases cited.*)

Milly Dawson, a witness, swore this: "she knows, after the negro was brought home, Susannah Watts claimed the negro." This declaration of Susannah Watts, was explanatory of the nature of the possession which she had of the negro. It went to show the possession to be one in her own separate right. The declaration was therefore admissible in favor of her and of those claiming under her, according to the above stated principle.

This witness also testified to this: "during their stay in Hall, Susannah Watts made a deed of gift of Charity to John Watts' oldest daughter, Susannah." If this was true, the deed, itself, was better evidence of it. And nothing appears to show the deed not to have been within the possession or the power of the plaintiff. And unless something of this kind appears, none but the best evidence is to be received.

It was right of the Court, therefore, to reject this testimony.

This witness and her husband, Benj. Dawson, jointly, testified as follows: "They say Susannah Watts lived constantly with them from the time John Watts went from Hall County. They know she did not know where John Watts had gone; their reasons for saying so, is because they often heard her

Dawson *vs.* Callaway.

:say so, and because she made many efforts to find where he
was." "*Because they often heard her say so,*" was objected
to by the defendant, and ruled out by the Court.

[5.] Taking this whole statement together, we understand
the witnesses to mean, that these sayings of Susannah Watts
were made during the time when she was making "the many
efforts to find where he was," of which they speak. If we
are right in this, these sayings were the natural, if not the ne-
cessary accompaniments of those efforts; and so, were ad-
missible as evidence, under the principle of the *res gestæ*, in
the same manner as was her declaration, above noticed, ex-
planatory of her possession of the slave Charity.

Was the charge of the Court below right?.

The main proposition in the charge was this : "that as no
administration on the estate of John Watts or his widow was
shown, the possessions of John Watts and his widow, after-
wards of his daughter, were separate and independent posses-
sions." And this proposition was one which we think might
or might not have been true, according as the facts might im-
port one or another of two things. If the import of the facts
was, that the possessions of the widow and of the daughter,
were respectively acquired in any other manner than as the
successive representatives of John Watts, then it was true that
the possessions of the widow and of the daughter, were "se-
parate and independent possessions." But if the import of the
facts was, that these possessions, which the widow and the
daughter had, were acquired by them as the representatives
of John Watts, then it was not true that the "possessions
were separate and independent possessions." And that "no
administration on the estate of John Watts or his widow was
shown," was by no means conclusive that the widow did not
represent John Watts—and by no means conclusive that the
daughter did not represent the widow. If the widow took
possession of the slaves as the executor in her own wrong, of
John Watts, she held the slaves as the representative of John
Watts; and if the daughter took possession of the slaves, as
the executor in her own wrong, of the widow, she held the

slaves as the representative of the widow; and therefore, as the representative of John Watts,

An executor in his own wrong, may be such representative.

An executor in his own wrong, is subject to an action by the rightful executor, by the creditors and by the legatees. (*Wentworth Ex'rs*, 331, *and note* (1). *Wms. Ex'rs*, 141, *and notes* (*h*) *and* (*i*).

"All lawful acts which an executor *de son tort* doth, are good." (*Id.* 145, *quoting from Coulter's Case*, 5 *Co.* 30 *b*.)

Such an executor is to "be sued, generally, by the name of executor of the last will and testament of the defunct." (*Went. Ex'rs.* 328.) So, such an executor may be sued, jointly, with the rightful executor, if there is one. (*Id. Ibid.*)

An executor in his own wrong, then, it is clear, is the representative of the deceased person whose estate he takes into possession.

Therefore, it may be that the import of the facts in this case is, that the widow of John Watts was, as to the possession of the slaves, the representative of John Watts; for that import may be, that she took possession of the slaves as executor in her own wrong.

And in like manner, the executor in his own wrong, of an executor in his own wrong; may be the representative of such first deceased person.

This would seem to be a proposition that follows from the principle, that "the executor of an executor, how far soever in degree remote, stands, as to the points both of being, having and doing, in the same state and plight as the first and immediate executor;" (*Went. Ex'rs*, 462, *and note* 1;) for an executor in his own wrong, is an executor. And then, to hold the contrary, we should have to say that an executor in his own wrong, has a situation, in some particulars, more advantageous than that which a rightful executor has.

This proposition would seem to be also involved in the 11th section of the Act of 1792, to protect the estates of orphans, &c. which section is as follows: "All and every the executors and administrators of any person or persons who, as ex-

ecutor or executors, in his or their own wrong or administrators, shall waste or convert any goods, chattels, estate or assets of any person deceased, to their own use, shall be liable and chargeable in the same manner as their testator or intestate would have been, if they had been living." (*Pr. Dig.* 229.)

And this proposition seems to be expressly affirmed by the Act of the 43 of *Elizabeth*, against fraudulent administrations. That Act says: "that every person and persons that hereafter shall obtain, receive and have any goods or debts of any person dying intestate," "upon any fraud, as is aforesaid, or without such valuable consideration as shall amount to the value of the same goods or debts, or near thereabouts, (except it be in or towards satisfaction of some just and principal debt, of the value of the same goods or debts to him owing by the intestate, at the time of his decease,) shall be charged and chargeable as executor in his own wrong," &c. (*Schley's Dig.* 234.)

And this proposition seems to be a consequence of the doctrine of Equity, "that where the trust property has been improperly disposed of, and is capable of being followed *in specie*," a Court of Equity "will compel the trustee or the party in possession (if the latter have taken with notice of the trust) to re-convey the estate to the purposes of the trust." (*Hill on Trustees*, 522.)

From all this, we think it safe to conclude that an executor in his own wrong, of an executor in his own wrong, represents the first testator or deceased person.

[5.] The daughter then, as well as the widow, her mother, might, in this case, have been the representative of John Watts, after his decease, although it was so that no will was left by him, and that no administration was granted on his estate; for she might have been the executor in her own wrong of her mother, and her mother might have been the executor in her own wrong of John Watts; and if they had been such executors, that would, according to what has been said above, have made them successive representatives of John Watts.

Whether either was such executor or not, was a question which depended on the import of the facts in evidence.

If they were such, then it follows, that if John Watts was, with respect to the slaves, the bailee or trustee of Susannah Watts, they were equally, each in succession, such bailee or trustee.

[7.] And if this relationship of bailee and bailor, or trustee and *cestui que trust*, subsisted between Watts, his widow and daughter, successively, on one side, and Susannah Watts on the other, then the Statute of Limitations could no more begin to run in favor of the widow and daughter, respectively, until they had converted the property—the slaves—to their own use, and Susannah Watts had obtained knowledge of such conversion, than it would begin to run in favor of John Watts, himself, until these things had happened, as to him.

And this is what the Court should have told the Jury.

The facts in evidence had three aspects, each demanding a charge.

If the case was, that John Watts, and not Susannah, really bought the slave, Charity, then she was his to a certainty.

If the case was, that Susannah Watts, and not John, really bought the slave, then, still, if John, as a *trespasser*, converted the slave to his own use, the Statute of Limitations commenced running in his favor, from the moment of such conversion; and so, by the time of trial, would have made, for him and those claiming under him, a bar to an action for such conversion.

If, however, the case was, that Susannah, and not John, bought the slave, and that John got possession of the slave as bailor from Susannah, or as trustee for her, and the possession under this relationship continued in him until his death, and then passed into his widow, as his executor *de son tort*, and remained in her until her death, and then passed into her daughter, as executor *de son tort* of the widow, and remained in her until her marriage with Callaway, then, up to the time of this marriage, the Statute of Limitations had not commenced running at all.   In short, if this relationship ever existed.

at all, that Statute did not commence running until the rela-·
tionship terminated; and if the relationship terminated by
means of a conversion of the property, not until that conver-·
sion and notice, or knowledge of it, had come to Susannah
Watts.

The Court below told the Jury, "that if Mrs. Watts held
the property more than four years, and had a statutory title,
the defendant could plead it in bar of this action, though he
did not claim under Mrs. Watts."

[8.] In this, we think the Court was in error.    The Statute
of Limitations may be pleaded by the person in whose direct
favor it operates, and by all those claiming *under* him ; and,
according to our understanding of the law, by none else.
Even those in whose direct favor the Statute operates, are
not bound to plead it ; they may waive it.    How, then, can
strangers get the right to plead it.

The words of the Statute, however, do not give the benefit
of the bar to strangers.    They give it to the party who can
say that the cause of action has not risen against *him*, at
any time within four years.

[9.] In this case, the defendant's Counsel "proposed to
examine the defendant on the merit of the case, not touched
upon by the direct examination.    Plaintiff objected, and in-
sisted that the cross-examination must be confined to the
subject-matter of the direct examination.    The Court over-
ruled the objection of plaintiff, and allowed the examination
to proceed."

We think the Court was right.    There is certainly doubt
as to what is the rule in such cases; but the decision of the
Court seems to have the support of the English decisions.
(*R. vs. Brook*, 2 *Stark. R.* 472.    *Morgan vs. Brydges*, *Id.*
314.    1 *Stark. Ev.* 161.    1 *Phil. Ev.* 274.    1 *Greenlf. Ev.*
§445.)

And those decisions are, in general, better evidence of'
what the law of Georgia is, than are any other decisions, ex-
cept those made by the Courts of Georgia; and the decisions

of these latter Courts have, we think, agreed with the English decisions.