1. Counsel for the plaintiffs in error, defendants in the trial court, having suggested in their brief that one of the errors alleged to have been committed might be corrected by direction to write off a stated sum from the money judgment recovered by the plaintiff below, and counsel for the latter having replied that, in order to avoid a long argument upon a question about which there might be some doubt, they were "willing as invited" to write off the sum stated, direction will be given that the sum be written off as thus agreed, and no further ruling will be made as to such item.
2. The petition as amended having alleged the making of certain payments upon indebtedness to the defendants, testimony of one witness that he furnished to another person "some cotton bills and other information" showing payments which he had made for the plaintiff, and that such information was correct to the best of his recollection, plus testimony of the other person that the payments thus appearing aggregated a certain amount, was sufficient to show prima facie that payments had been made in that amount. The testimony of each witness depended upon his own knowledge and credibility, and therefore the evidence of neither, nor the combined evidence of the two, could be properly rejected as hearsay.
(a) It follows that a charge to the jury based on such evidence was not subject to the criticism that it was without evidence to support it.
(b) Moreover, there was additional evidence tending to support the charge.
3. In view of the entire charge on the degree of proof necessary to establish the oral agreement alleged and relied on by the plaintiff, the excerpt complained of was not subject to the criticism, that it erroneously required proof of such contract only by a preponderance of the evidence, and that such error was not cured by a further instruction to the effect that the alleged contract and its terms must be established so clearly, fully, and satisfactorily as to leave no reasonable doubt as to such matters. *Page 627 
4. Under the pleadings and the evidence, the judge's charge to the jury, submitting the question as to what payments, if any, had been made on the notes but not credited before rendition of judgments thereon, was not erroneous upon the ground that the issue as to such payments was concluded by the judgments.
(a) The judge sufficiently charged the jury upon the subject of interest, in the absence of a request for further instructions.
(b) In so far as the findings of the jury were assailed as being unsupported by evidence, they were not subject to such attack, unless it should be otherwise as to one item, concerning which as shown in the first headnote, no decision is required.
5. The questions presented by the motion to construe the verdict and modify the decree are controlled by what has been stated in the first, second, and fourth headnotes, and corresponding divisions of the opinion, relating to the motion for a new trial.
 No. 14829. NOVEMBER 15, 1944. REHEARING DENIED DECEMBER 4, 1944.
On July 16, 1918, George W. Bailey and R. L. McElhannon filed a suit in equity in the superior court of Jackson County against John C. Turner, Jefferson Banking Company, and John C. Turner "as executor of Mrs. Sarah A. Turner, deceased," praying for a decree of title to described lands, injunction, accounting, and general relief. The defendants filed separate demurrers, general and special. Before the demurrers were ruled on, the petition was amended by striking the name of McElhannon as a party plaintiff. Thereafter, the court entered an order sustaining all of the demurrers, and Bailey, the remaining plaintiff, excepted. This court reversed the judgment. Bailey v. Turner, 150 Ga. 823
(105 S.E. 471). The defendants filed separate answers, denying the substantial allegations of the petition, and the petition was further amended. A trial was had in 1924, resulting in a nonsuit. This judgment also was reversed. Bailey v. Turner, 160 Ga. 214
(127 S.E. 616). After further amendments to the petition, and after the answers were also amended, another trial was had in 1938, which resulted in a mistrial. Later, Georgia W. Bailey died, and his administratrix, Mrs. Elizabeth Bailey Hardy, was made party plaintiff in his stead.
In 1943, the case was tried again. After the introduction of evidence by the plaintiff and the defendants, the judge submitted several questions to the jury, which they answered. Based on these answers, the court entered a decree, in which the plaintiff administratrix *Page 628 
was given judgment against John C. Turner for $4050 (see answers to questions 6 (b), 10, and 11, infra), and the Jefferson Banking Company was given judgment against the plaintiff for $3550, with a special lien on the lands, title to which was decreed to be in the plaintiff administratrix, subject only to said lien in favor of the banking company. The defendants jointly filed "their motion to construe the verdict returned by the jury . . and to modify and change the decree entered thereon." They also filed a motion for a new trial, which was later amended. The judge overruled the motion to construe and modify, and refused a new trial. The defendants excepted, assigning error on these judgments.
The petition as amended at the time the case first appeared in this court alleged substantially: Bailey borrowed money from Mrs. Sarah A. Turner in 1907, and again in 1911, giving his notes therefor secured by deeds to land, and receiving bonds for title. In 1911, he also executed a note for $1750, endorsed by R. L. McElhannon and others, to Jefferson Banking Company for money borrowed, securing the same by a transfer of the bond for title last issued to him by Mrs. Turner. All these loans were made through John C. Turner, as agent for his mother Mrs. Turner, and as cashier and general manager of the bank. In 1911, it was agreed between the plaintiff and Turner, representing his mother and the bank, that the plaintiff would have his tenant to pay to Turner the rents on the lands described in the security deeds, to be applied by Turner on the notes of the plaintiff to Mrs. Turner and the bank. "The defendants agreed to carry said loans so long as they received said rents, and until the said George W. Bailey could reduce the debts and secure new loans, or else find a purchaser for all or a part of said lands at an advantageous and agreed price." In accordance with this agreement, the plaintiff's tenant did pay the rents to Turner for several years.
In 1924, Mrs. Sarah A. Turner died, and John C. Turner qualified as executor of her will. Thereafter, "recognizing the difficulty of making titles to prospective purchasers," and at the suggestion of John C. Turner, the plaintiff agreed with Turner that the plaintiff's notes to Mrs. Turner and to the bank would be sued; "that they would not delay the suit by going into a settlement as to rents, but that judgment should be taken on the notes as they stood, and later in a final settlement the rents should be entered as credits on *Page 629 
the notes [judgments?];" that the lands described in the security deeds would be sold by the sheriff; that Turner would buy the lands at such sale, "and that the amount of said loans would be counted in the bid or settlement, and that then he would be substituted for the original lender, and would hold the title to secure the amount involved in said bid, and that the old arrangement as to paying the rents over to him each year should continue in force; that the said George W. Bailey could then go forward without difficulty as to titles, and pay on said loans and reduce the same and later secure a new loan, and that said Bailey could make a deed to secure the same, and that he [Turner] would quitclaim, or that he would allow Bailey to sell any part at a price agreed upon as fair by them both, and that he would release the part or all so purchased." Accordingly, suits were filed on the notes and judgments obtained against the plaintiff. Executions in favor of John C. Turner, executor of Mrs. Sarah A. Turner, were levied on the lands described in the security deeds, and bid in by John C. Turner as executor, "far below the real value of said lands." The plaintiff and Turner were present at the sale, which took place on December 7, 1915, and the agreement last mentioned "was again reiterated." "In accordance with the agreement under which said sale was made, the said George W. Bailey was still the owner of said lands, and no claim of ownership was made by John C. Turner nor any one else, and said Bailey continued in possession . . and directing his tenant . . to continue to pay rents to John C. Turner, and that under his direction the said tenant paid to John C. Turner the rents" for 1916 and 1917, aggregating $3800, which amount should have been credited on said debts as agreed.
In February, 1918, the plaintiff learned that Turner claimed there was due on the plaintiff's note to the bank the sum of $2500, and the plaintiff went at once to Turner and demanded a settlement; and "said Turner promised to make him a statement showing all his rents and credits, but stated that it would take some time to do it. . . When he failed after due time to make such a statement, he went to see him again and was again put off by excuses and promises. That petitioner . . became apprehensive at this delay, and secured the promise of a loan amply sufficient to pay all that Turner might hold against him, and then went again and demanded of said Turner a settlement and offered to pay all that was *Page 630 
due, and that to petitioner's amazement he refused to make a settlement, saying, `I've been studying about this farm proposition from time to time. Lands have advanced, cotton is high, and I do not think it would be right, or that you would now expect me to do this. I would have done it back yonder, but now I ought not be required to do this for nothing. I ought to have something out of it, over and beyond the debt.'" After said Turner, as executor and as cashier of said bank, refused to settle with the plaintiff, and after he had declared he would not carry out said agreement, the plaintiff proposed to him that he would go and get the money, as he had arranged for it and pay the amount due on all said fi. fas., and Turner replied that he would not accept the money, and it was useless to bring it, saying that he knew the plaintiff was in position to make tender of the actual cash. J. C. Turner in all of said transactions acted as the representative of the estate of Sarah A. Turner, and as such he agreed to make the sale of said property through the sheriff, and said contract as set out was made with him as executor, "and as executor he was to bid in and hold said land in the estate of said Sarah A. Turner until all the debts due said estate were paid, and that the rents paid from said land should be credited on said debt, and that, when the balance of said debt was paid, said land was to be his [plaintiff's] land and conveyed to him."
Jefferson Banking Company in its answer alleged that the bond for title referred to in the petition was transferred to it by the plaintiff to secure a note for $1800, in addition to the one for $1750 endorsed by R. L. McElhannon and referred to in the petition.
In 1924, during the trial that was reviewed in 160 Ga. 214, supra, the plaintiff filed an amendment which contained a statement of rents alleged to have been paid to Turner during the years 1913-1923 inclusive, and in which it was averred "that the balance due to the plaintiff [Bailey] after paying off said estate and bank, for which he asks judgment against defendant, is $1915." In 1935, another amendment was filed, in which it was alleged that "since said tender the main dwelling on said land has been destroyed by fire, entailing a loss of $1200 to $1500, lessening the value of the land to that amount;" also, that at the time of the plaintiff's tender and refusal of the defendant Turner to carry out his agreement, the said tracts of land were worth $35,000, whereas "the present value *Page 631 
of said land . . is only" $5000, "making a difference in the value of said land from then [the time of tender] to now in the sum of" $30,000, "and this amount plaintiff . . claims as damages against said defendants." In 1938, the plaintiff filed another amendment, in which he alleged: "That, after paying all indebtedness due the defendants, there came into the hands of J. C. Turner, as executor of Sarah A. Turner defendant in the way of rents in the net amount of $8290.04 and government checks of $987.50 and interest on said principal amount in the sum of $3986.01 to this date, and plaintiff is entitled to recover the land described in his original petition and said sums from said defendant [John C.] Turner, as such executor, in addition to the value of the house [that was destroyed by fire] mentioned and described in his amended petition. A bill of particulars of said sums is hereto appended as part of this amendment." No objection or demurrer was interposed to any of these amendments or to the petition as thus amended.
In 1938, the defendants jointly filed an amendment to their separate answers "by setting out a complete accounting of all rents received from the lands in question in this case from 1911 down to 1938, February 1st. For John C. Turner, exct. of the estate of Sarah A. Turner, deceased, and the Jefferson Banking Company." According to the statement attached to this amendment, George W. Bailey on February 1, 1938, was indebted to the estate of Mrs. Turner in the sum of $1084.62, and to the Jefferson Banking Company in the sum of $13,584.56.
On the trial in 1943, which is now under review, the questions submitted to the jury and the answers thereto were as follows:
"1. Did George W. Bailey individually and John C. Turner as executor of the will of Mrs. Sarah A. Turner, deceased, make the alleged contract as set out in plaintiff's petition as amended, by which George W. Bailey was to have the right to redeem the lands sold at sheriff's sale as set out and described in plaintiff's petition as amended, and on the terms as also alleged in plaintiff's petition as amended? Answer: Yes. If you answer the above-stated question numbered `1' in the negative, that is, `No,' you will not answer any of the following questions. If you answer the above stated question in the affirmative, that is, `Yes,' then you will answer the following:
"2. Did George W. Bailey perform his part of this contract up *Page 632 
to and including the sheriff's sale of the land involved in this suit? Answer: Yes.
"3. Did what was done by the parties to this contract referred to in question No. 1 in performing it up to and at the time of the sheriff's sale of the lands in question cause these lands to sell for less than their real value? Answer: Yes.
"4. Did George W. Bailey make an offer of tender of the whole amount due by him at that time to John C. Turner as executor of the will of Mrs. Sarah A. Turner, deceased, and to the Jefferson Banking Company, as alleged in plaintiff's petition as amended? Answer: Yes.
"5. Did John C. Turner as executor of the will of Mrs. Sarah A. Turner, deceased, and as cashier of the Jefferson Banking Company inform said George W. Bailey that the money would not be accepted if actually tendered, or words to that effect? Answer: Yes.
"6. What is the correct status of the original indebtedness of the plaintiff to John C. Turner as executor of the will of Mrs. Sarah A. Turner, deceased, and to the Jefferson Banking Company, that is to say:
"(a) Is anything now owing by the estate of George W. Bailey on the judgments and fi. fas. issued thereon in favor of John C. Turner as executor of the will of Mrs. Sarah A. Turner, deceased, against George W. Bailey, and if so, what amount of principal and interest? Answer: No.
"(b) Is anything now owing by the estate of George W. Bailey, deceased, on the judgments and fi. fas. issued thereon in favor of the Jefferson Banking Company against George W. Bailey, and if so, how much of principal and interest? Answer: Yes. $3550 principal, no interest.
"7. Has George W. Bailey overpaid John C. Turner as the executor of the will of Mrs. Sarah A. Turner, deceased, or the Jefferson Banking Company? Answer: Yes.
"8. If you answer and find that he overpaid John C. Turner as executor of the will of Mrs. Sarah A. Turner, deceased, state how much: Answer: $3550 principal, no interest.
"9. If you find and answer that he overpaid the Jefferson Banking Company, state how much: Answer: No principal.
"10. What was the market value of the tract of land described *Page 633 
in plaintiff's petition as the White place at the time the contract referred to in question No. 1 was made, if made, with
the main building thereon? Answer: $12,500.
"11. What was the market value of the said tract of the White place at the same time of the making of the contract referred to in question No. 1 above, if made, without the main building thereon? Answer: $12,000."
Taylor Hartley, introduced as a witness by the plaintiff, testified on direct examination: "I rented it from Mr. George Bailey and paid him the rent in 1908, also in 1910. I don't remember about 1911. I don't remember when I began turning over rents to Mr. Turner for the Sarah A. Turner estate. Mr. Bailey took a rent note one year, but I don't remember whether it was `10 or `11, but he took the note for one year but I think I paid the rents over to the bank. Up until the sale I paid the rents to Mr. Bailey, or might have paid it to Mr. Turner at Mr. Bailey's direction. After the sale I paid it to Mr. Ernest Duke and he paid it to Mr. Turner. Mr. Bailey did not come up there very much after the sale — we never did talk very much about it. . . The White farm [the Bailey place] was a good farm. I don't remember just how much we made between 1911 and 1918, but we made pretty good crops. I don't recall just how much was made in any one year. In 1917, 1918, and 1919 we paid good rents, I think about $2400 in 1919, about $2300 in 1918, and in 1917 down a little, something like $1700 or $1600. I don't recall getting below $500. I don't remember the average rentals for the years `38, `39, `40, `41, `42. I wouldn't have much idea, but something like $600 or $700 per year — some might not have run that much and some run more. When I would sell cotton I would bring the cotton bill to Mr. Turner and he would figure out the rents. We would always agree on a price and I would buy the rent corn. All of my rent agreements were not made with Mr. George Bailey and Mr. Duke. I always consulted Mr. Turner."
Cross-examination: "I have lived on this farm since 1908. Am not sure, but I think I paid the rents 1909, 1910, and 1911 to Mr. Bailey. I know Mr. Bailey took a rent note for one of those years, and my recollection is that I paid it off at the bank. . . I was talking about 1919 and 1918 when I stated that I paid around $2400 and $2300 rents. I don't recall how much in 1914, but it *Page 634 
wasn't so much; nor do I recall how much in 1915, but nothing like $2300 or $2400. In 1914 I don't know, but think it ran $1300 or $1400. I did not keep any books, and during the thirty-five years I have been there most of my dealings have been with Mr. Turner, and I have always found his books straight and correct. I don't recall how much rent I paid in 1921, but I think around $800; 1921 was the first year after Mr. Duke died. I don't recall how much I paid in 1922 or 1923, I don't know whether $279.44 in 1924 is correct or not; that was a mighty short crop year. I guess $222.50 is about right for 1926; 1927 was a little better crop year. I recall that I had to pay my `24 and `25 fertilizer bill out of the 1927 crop, not having made enough in `24 and `25 to meet my fertilizer bill. 1928 was a little better year, but I don't remember whether $407.50 is the amount paid that year or not. I don't recall about 1930. I am not sure about 1931; $69.30 may be about correct for that year. I don't know whether $111.17 is correct for 1932 or not. I know during these years a man who only got one-fourth of a bale of cotton did not get much. I suppose $325.83 was about right for 1933. If the books for 1936 show $233.11, I would say that is about correct. I don't know whether I furnished the information showing how much rent was paid from 1912 through 1923 or not. I didn't keep no records and don't remember furnishing the figures. If Mr. Turner's books for 1928 show $407.50, the $1329.08, set up in the amendment, would not correspond, and if the books show $608.67 in 1927, $1594.95 would not correspond with that. I do not recall how much rents I paid from 1912 through 1923, and from 1924 to 1937, but $35,205.51 would be a good deal of money. Mr. Turner paid the repairs and drainage; I don't know about the taxes and things like that. We done some repairs in 1917, which Mr. Turner paid for. I don't know about $298.01 is the correct amount or not. I don't know whether $274.39 is the amount spent for repairs or not. . . The repair money was not turned over to me, only lumber, shingles, and other things to be used, and we did a good deal of covering. When I first moved there, I rented from Mr. Bailey. I don't know of my own knowledge who bid the land in when it was sold, but from 1908 to 1916 I had been dealing with Mr. Bailey. I recall coming to Jefferson and having a conversation with Mr. J. C. Turner and Mr. E. Duke of Pendergrass, and Mr. Duke rented this property from Mr. Turner in 1916. . . *Page 635 
Mr. Duke rented this property from Mr. Turner from 1916 through 1920, and I subrented it from Mr. Duke. Yes, that's my signature on those papers (witness identifies landlord-lien notes from F. T. Hartley to E. Duke). After Mr. Duke's death in 1920, I rented from Mr. Turner, he furnishing me, and from that time to the present my dealings have been with Mr. Turner, at least Mrs. Hartley has been renting the land in her name, but I was handling the business as her agent, and this has continued from 1922 up to the present time."
Redirect examination: "I kept the bills, but I don't remember telling Buddy Bailey how much rents I paid each year. They might have figured on it but I don't remember taking the bill or trying to figure for them what I paid on rent."
J. L. Bailey, sometimes referred to as "Buddy" Bailey, a brother of the original plaintiff, George W. Bailey, testified on direct examination: "George asked me to figure out the amounts for these amendments. He got Taylor Hartley to come down to his house. Now you take 1912: Mr. Hartley did not have all of his cotton bills, but he had some of every year, and some of the years he had them all, but he remembered the bales of cotton made, and when he didn't have the bills, he would take the average, the weights and the bales that [he] did not have and make them weigh the average of the bills we did have and use the same price as was on the bills. Mr. Hartley agreed to the figures, and it showed from 1912 through 1923 $22,043. . . This ran through the year 1923. We got the amount of the government checks from Mr. Hartley. We also put down some for plowing up cotton, and when we got these figures from Mr. Hartley, and the rents, and this record was made when everything was fresh — we kept those cotton bills a little while, and I told him I wanted to check them and see if they were correct. . . The $8194.04 is principal. The $8174 through the year 1937, and $3986 interest, the two together making a total of around $12,000. This does not cover `38, `39 and `40. It seemed to me the note should have been overpaid several thousand dollars, as we figured up the payments to about $36,000."
Cross-examination: "In my conversations with Mr. Hartley about what he had or had not paid, I never did hear him say that Mr. Turner was not keeping the books correct. . . The amendment we got up runs from `25 through `37. We had some bills, *Page 636 
and I suppose guessed at the rest. I just took what Mr. Hartley gave me for 1933 through `37, but did not make no effort to get the correct amount of cotton from the AAA office which was right at my door. . . If Mr. Turner's books for 1916 shows for forty-three bales of cotton, and we put 65 bales in the amendment, I don't know which is correct; I just took what Mr. Hartley said there, as some of the cotton bills was misplaced; but he told me just how many he made. My only conversation with Mr. Turner was about my transaction. . . I would not say whether we had the wrong information or not. I just took what Mr. Hartley said."
After the witness J. L. (Buddy) Bailey had testified as above, and after some additional evidence had been introduced, Taylor Hartley, on being recalled by the plaintiff, further testified: Redirect examination: "Yes, I remember furnishing Buddy Bailey some cotton bills and other information that was testified about them yesterday. That slipped my mind, but the best I recollect, I did furnish it. I don't know about it being correct, but it was to the best of my recollection and was fresher then." Recross-examination: "I think I was over at Buddy Bailey's house when I gave him the information, but do not remember what year it was, and can not give you [any] idea what year it was. I don't know whether it was around 1924 or not."
The testimony of George W. Bailey, the original plaintiff, as given at the trial in 1938, he having since died, was read to the jury. This witness, after testifying as to the agreement with Turner, and as to the sale in 1915, stated: "I had already rented it to Mr. Hartley while being advertised, explaining to him how it was going to be, and traded with him for another year. I traded with Hartley and Mr. Duke and I changed the trade, I think it was in February or March the following year. Mr. Duke was going to furnish Mr. Hartley that year, and he wanted to rent the land from me himself so he could take a lien for supplies on Mr. Hartley. I told them I had already rented it, but did not know how it would change the matter. The rent from the farm was to go to Mr. Turner. All I wanted was for Mr. Hartley to cultivate the place and pay the rents to Mr. Turner. . . There was no change in the supervision. I would go up there and confer with my tenants. We discussed more or less what and where crops were to be planted. This continued in 1917, Mr. Turner getting the rents for 1916. *Page 637 
Mr. Hartley paid the rents to Mr. Duke, and Mr. Duke on to Mr. Turner, this continued in 1917 without interruption. . . When Mr. Holder informed me that Mr. Turner wanted to see me back before he sued his notes, I went to see him and he said there was credits due on the notes but there was no necessity for making settlement. I do not remember how much I owed Mrs. Turner at that time; the notes would show. . . If the rents had been credited on the note, I wouldn't have owed him a dime in 1924. I considered that he owed me about $1800 after Mrs. Turner and Jefferson Banking Company was paid. He would owe me about $500 per year from the rent since 1924 with interest. . . When we made the original agreement in 1911 Mr. Turner was to take care of the taxes which was to be charged against the rent. When Mr. Duke died in 1920, I went to Mr. Turner and told him that Mr. Ernest Duke was dead and that he had been furnishing Taylor and somebody would have to take care of him. This Mr. Turner agreed to do. Prior to 1916, I had been helping Mr. Hartley a little. In 1916, Mr. Duke agreed to furnish him if I would rent him the land and let him be Taylor's landlord. This was in `16, `17, `18, and '19, and in 1920 Mr. Duke died."
The defendant John C. Turner testified: "The case seemed hopeless to me, and I had a talk with Mr. Bailey and suggested that the notes be placed in judgment, sell the land, and whoever bought the land in could do with it as they pleased. I did not want the land, but if it did not bring a sufficient amount or approximately amount to pay the debt, I would bid it in, which I did. The land was put up and sold, and I bid it in as executor of my mother's estate. If there was any intimation or suggestion, or anything about selling the land to perfect the titles, I knew nothing about it; it was a regular sale. I did not promise Mr. Bailey or anyone else that I would buy in this property and give him the privilege of paying the amount that was owing and me make them a deed; I did not do that. From that time forward, I was landlord. Mr. Taylor Hartley came to see me while the place was being advertised, wanting to know about it, and I told Mr. Hartley I could not rent it to him as I did not know who was going to buy it. Mr. Hartley and Mr. Duke came down to the bank, I think it was the afternoon of the sale, and Mr. Duke told me that he wanted to rent the place, and I rented it to him, one-third and one-fourth, and he was to let Mr. *Page 638 
Hartley stay on. Mr. Duke was my tenant for 1916, 1917, `18, `19, and `20, and made written reports to me each year of the rents. Mr. Duke died in December, 1920, before the report was made for that year," and his administrators "made the report to me for 1920. After Mr. Duke's death, Mr. Bailey came into my office and told me that Mr. Hartley could not finance it, so I agreed that I would. Mr. Hartley was my tenant in 1921, and from then up until now, Mrs. Hartley has been my tenant, Mr. Hartley having some financial obligations, and Mrs. Hartley [owning] the stock, I preferred to deal with her. Mr. Hartley would sell the cotton and bring in the bill, I would make the calculations on the back of the invoices, get the totals, deduct the fertilizer and calcium arsenate, what repairs I had against him, and divide the rents. I gave Mr. Hartley the invoices back so he could check against it, and he never did complain of any errors. I went into this land in December, 1915, as executor, for I had paid for it. If Mr. Bailey was ever on that place after I bought it until the day of his death, I knew nothing about it, and nobody reported it to me, except one time when he came into my office and said the county authorities were considering making a change in the road, and that, if I wished him to, he would go up and see about it for me, and I told him I would appreciate it, and he came back and reported that in his judgment the road should not go where they wanted to put it — that was the last of it. In all questions of rents and repairs, Mr. Hartley would come in to see me about it and I paid the bills. . . After I bought the land and rented it to Mr. Duke in 1916, I never did hear any complaint or statement from George W. Bailey about him until 1918 when land got high. Mr. Bailey did not approach me in 1916 or `17, or intimate to me that he still [owned] the land. I was renting the land to Mr. Duke every year and collecting the rent. He did not own it because it had been sold. . . The Jefferson Banking Company has never received one penny during the 28 years that these notes have run. . . I have only received from the government as rentals and parity from this farm for 1934, `35, '36, `37, `38, `39, `40, and `41 the sum of $739.45. . . If I had had such a contract as Mr. Bailey claimed, though I did not have any such contract with him, and had agreed to allow the rents to liquidate the loan, the loan to Sarah A. Turner would be overpaid at this time about $680, with absolutely nothing paid to the Jefferson *Page 639 
Banking Company, he now owing the Jefferson Banking Company over $15,000."
Other facts, including grounds of the motion for new trial, and of the motion to construe the verdict and modify the decree, will be stated in the opinion.
(After stating the foregoing facts.) 1. In the first special ground of the motion for new trial, it is contended that the judge erred in submitting to the jury questions 10 and 11, relating to the building that was destroyed by fire; in charging the jury in reference thereto; and in embodying in the decree an award of $500, based on the answers to such questions. In the briefs for the plaintiffs in error, it is stated that the allowance of $500 against John C. Turner for this building was contrary to law, but that "this might be corrected by direction to write it off." Counsel for the defendant in error stated in reply: "While we believe it [the item of $500] would be upheld by the court, and that the judgment of the trial court is correct, yet to relieve a long argument in the brief on the question that there might be a slight question of doubt, we are willing, as invited in the brief of the plaintiffs in error, to write off this $500 from the decree." In view of these statements of counsel, direction will be given that $500 be written off that part of the decree awarding a money judgment in favor of the plaintiff, and no further ruling will be made regarding the first special ground.
2. The seventh and eighth questions submitted to the jury, and the answers thereto, were as follows: (7) "Has George W. Bailey overpaid John C. Turner as the executor of the will of Mrs. Sarah A. Turner, deceased, or the Jefferson Banking Company? Answer: Yes. (8) If you answer and find that he overpaid John C. Turner as executor of the will of Mrs. Sarah A. Turner, deceased, state how much. Answer: $3550 principal, no interest."
In special ground 2 of the motion for new trial, it was alleged: (a) that the court erred in failing to inform counsel that the case would be submitted on questions until the delivery of the court's charge after arguments had closed, thereby depriving the movants of the benefit of having counsel discuss with the jury the questions *Page 640 
they were about to be required to answer, and thereby creating a situation confusing to the jury and to counsel in the case; and (b) that the court erred in submitting to the jury the question as to whether or not the debt due by George W. Bailey to the estate of Sarah A. Turner had been paid, since, as movants contended, the only legal evidence demanded a finding that, if the debt was overpaid, the excess did not and could not amount to more than $680, as "the testimony of Taylor Hartley and J. L. Bailey was hearsay and without probative value and could not create an issue against the positive and uncontradicted testimony of John C. Turner to the effect that, if the contract contended for by the plaintiff existed, the overpayment then (August, 1943), would be about $680, and as movants contend, there was no other evidence authorizing a different finding, and these errors were harmful and prejudicial to movants and entitle them to a new trial." In this ground of the motion, excerpts from the testimony of Taylor Hartley and J. L. Bailey, witnesses for the plaintiff, and John C. Turner, for the defendant, were set forth, which excerpts with their settings are included in the preceding statement.
The Code, § 37-1104, declares: "In the trial of any proceedings for equitable relief, upon the request of either party to said cause, made after the same is called for trial and before the beginning of the introduction of evidence, the presiding judge shall instruct and require the jury to find a special verdict of the facts only, and shall inform the jury what issues of fact are made by the pleadings. Upon the special verdict of facts, so rendered, the presiding judge shall make a written judgment and decree in said cause under the law applicable to the same." In Hardin v. Foster, 102 Ga. 180
(29 S.E. 174), it was held that, when a request is made in accordance with this statute, it is compulsory upon the judge to pursue the course therein prescribed, but that it is within his power, even without a request from either party, to require the jury to render a special verdict upon the issues of fact involved. See also Robertson v. Aycock, 170 Ga. 523 (4) (153 S.E. 213); Metropolitan Life Insurance Co. v. Saul,189 Ga. 1, 19 (5 S.E.2d 214). Whether the judge erred in failing to inform counsel before the arguments were closed that the case would be submitted on special questions, the error, if any, should have been challenged at the time, and complaint made for the first time in the motion for a new trial came *Page 641 
too late. Carter v. Lipsey, 70 Ga. 417 (2); Mayor c. ofMacon v. Harris, 75 Ga. 761 (7 a); McWhorter v. Ford,142 Ga. 554 (5 a) (83 S.E. 134); City of Atlanta v.Carroll, 194 Ga. 172 (2) (21 S.E.2d 86); Allen v.Allen, 198 Ga. 269 (6) (31 S.E.2d 483).
Nor can we sustain the contention, made in the same ground, that the testimony of the witnesses, Taylor Hartley and J. L. (Buddy) Bailey, as to payments was hearsay. Bailey testified that the payments as alleged in the answer were in accordance with information given to him by Hartley. Hartley testified: "Yes, I remember furnishing Buddy Bailey some cotton bills and other information that was testified about them yesterday. That slipped my mind, but the best I recollect I did furnish it. I don't [know?] about it being correct, but it was to the best of my recollection, and was fresher then." Bailey had testified: "George [the original plaintiff] asked me to figure out the amounts for these amendments. He got Taylor Hartley to come down to his house. Now you take 1912, Mr. Hartley did not have all of his cotton bills, but he had some of every year, and some of the years he had them all, but he remembered the bales of cotton made, and when he didn't have the bills he would take the average, the weights and the bales that he did not have, and make them weigh the average of the bills we did have and use the same price as was on the bills. Mr. Hartley agreed to the figures, and it showed from 1912 through 1923" the total amount of $22,043. While no decision by this court covering the precise point has been cited, and we have discovered none, there are several decisions by the Court of Appeals which deal with similar situations, and from which we quote as follows: "Each testified as to the extent of his own knowledge, but the two taken together present a state of facts supported by the several credibility of the two witnesses." Cabaniss v. State, 8 Ga. App. 129 (16), 145 (68 S.E. 849). "Sufficient prima facie proof of the correctness of an account is made by the introduction of the testimony of witnesses who swear that they had knowledge of the items, made memoranda of the same, and turned them over to a bookkeeper (though they do not at the trial remember the details of the items), supplemented by the testimony of the bookkeeper that he correctly copied these memoranda into the account (though the bookkeeper had no personal information as to the correctness of the items)." Swift v. Oglesby, 8 Ga. App. 540 (4) (70 S.E. *Page 642 
97). The testimony of a witness that a certain thing is true according to his best recollection necessarily implies that the witness has a recollection and knowledge upon the subject. AEtnaInsurance Co. v. Trimmier, 42 Ga. App. 745 (2) (157 S.E. 340); Barrington v. Davis Jenkins Sons, 44 Ga. App. 682
(4) (162 S.E. 642). These decisions substantially cover the question here presented, and we consider them sound as applied thereto. We conclude, therefore, that the evidence referred to by the movants in ground 2 was not hearsay, as insisted.
Nor was the following excerpt from the testimony given by George W. Bailey in 1938, and reintroduced upon the trial here under review, wholly without probative value, as contended: "If the rents had been credited on the note, I wouldn't have owed him a dime in 1924. I considered that he owed me about $1800 after Mrs. Turner and Jefferson Banking Company was paid. He would owe me about $500 per year from the rent since 1924 with interest." Where a witness testifies to a conclusion of fact which could be within his knowledge and such testimony is admitted without objection, it cannot be attacked on review as being incompetent or insufficient. Hutchinson v. State, 8 Ga. App. 684
(70 S.E. 63); O'Quinn v. Homerville, 42 Ga. App. 628 (4), 631 (157 S.E. 109); Bailey v. Newberry, 52 Ga. App. 693, 697
(184 S.E. 357). See also, in this connection, Sankey v.Columbus Iron Works, 44 Ga. 228 (3); Morgan v. Bell,189 Ga. 432, 439 (5 S.E.2d 897). This conclusion accords with the rulings in Bank of South Carolina v. Brown, Dudley, 62 (7); Dawson v. Callaway, 18 Ga. 573 (2); and Proctor Gamble Co. v. Blakely Oil c. Co., 128 Ga. 606 (2) (57 S.E. 879). In each of these cases, there was objection to the testimony, and it was excluded. In the instant case, there was no objection, nor does the statement appear upon its face to have been based on mere belief, and not upon facts within the witness's knowledge. See Shaw v. Jones, 133 Ga. 446 (3) (66 S.E. 240). The testimony of the defendant Turner was also contradicted upon other material issues, including the vital issue as to the alleged oral agreement, and therefore his credibility as a witness was a matter for the jury. Code, §§ 38-1803, 38-1806. It follows that the charge, submitting the questions as to whether the debt to Mrs. Turner had been paid, and as to the amount of the overpayment, if any, was not without evidence to support it, as insisted in ground 2. *Page 643 
3. Special ground 3 complained of the following charge: "The burden is on the plaintiff to satisfy you by the evidence in this case, that is, by a preponderance of the evidence, that there was such contract as set out in plaintiff's petition as amended with John C. Turner as executor of the will of Mrs. Sarah A. Turner, giving to George W. Bailey the right to redeem the lands involved in this suit after the purchase thereof by John C. Turner, as executor, at sheriff's sale, as contended by plaintiff;" it being alleged that the degree of proof required of the plaintiff was proof beyond a reasonable doubt, and not by a mere preponderance of evidence as here charged, and that such charge was not cured by the additional instruction, to wit, "And this alleged contract and its terms must be established so clearly, fully, and satisfactorily as to leave no reasonable doubt as to the alleged contract and its terms. And it must be established not only by a preponderance of the evidence, but as just stated to you."
The entire charge as given on the degree of proof necessary to establish the alleged contract consisted of the two excerpts quoted supra, together with the following: "If you find, therefore, from the evidence and under these instructions that there was such a contract and that the terms thereof as set out in plaintiff's petition as amended, then you would answer this question number one, `Yes.' If you find the contract and its terms as alleged in plaintiff's petition has not been established so clearly, fully, and satisfactorily as to leave no reasonable doubt as to the alleged contract and its terms from the evidence in the case, you would answer that question, `No.'"
When the charge complained of is considered with its context, no error appears. While jurors should not be left to decide between conflicts in a charge (Kelly v. Locke, 186 Ga. 620
(2 f), 627, 198 S.E. 754), yet, "If the charge is sufficiently clear as to be understood by jurors of ordinary capacity and understanding, this is all that is required, and such appears to us to be the case as to the charge of the court in this case."Georgia Railroad v. Thomas, 73 Ga. 350, 356. See also, in this connection, Gordon v. Spellman, 148 Ga. 394
(96 S.E. 1006); Wardlaw v. Wardlaw, 187 Ga. 468 (3) (1 S.E.2d 24);Mickle v. Moore, 193 Ga. 154 (17 S.E.2d 728).
4. Special grounds 4 and 5 may be considered together. In *Page 644 
special ground 4, the movants complained of the following excerpts from the charge:
"Now, of course, before you go into the question of amount, you will first answer the question, `Is anything now owing by the estate of George W. Bailey to Mrs. Sarah A. Turner's estate or to the Jefferson Banking Company?' and if you find there is not anything now owing, you will so state, and that would mean that you would not be required to find any amount because it would be nothing, if there is nothing owing. If you find there was something owing, you will then determine how much principal and how much interest in the case of the estate, if you find there was something owing the estate, and also in the case of Jefferson Banking Company if you find there is something owing to the Jefferson Banking Company.
"Now in determining these questions, gentlemen, you will take up all the evidence in the case that bears upon that issue and determine first what payments were made and not credited at the time judgments were obtained by defendants against plaintiff Bailey in the city court of Jefferson, if any, and determine whether or not plaintiff Bailey is entitled to credits on those judgments, and if so, how much. Then you would also take up the questions and determine what, if any, payments and credits the plaintiff Bailey is entitled to on these debts, or either of them, since the date of the judgments in the city court of Jefferson, these judgments being in evidence before you.
"You will take up and determine from all the evidence in the case what payments have been made in that regard, if any, and how much, if any, and by making the calculation you will be able to answer the question that I have just submitted to you [question 6]."
Error was assigned on these charges, as follows: (a) They submitted to the jury the question as to "what payments were made and not credited at the time judgments were obtained by defendants against plaintiff Bailey in the city court of Jefferson," when in law and in fact the plaintiff Bailey was concluded by the judgments and could not go behind them. (b) These instructions left the jury no standard by which to determine the amount due to the defendants by the plaintiff, and did not instruct the jury that interest was to be calculated on the principal amount due the Jefferson *Page 645 
Banking Company at the rate of 8 per cent., and left them to give or not give interest according to whatever whim might impress them, without regard to the contract between the plaintiff and Jefferson Banking Company and its right as a matter of law to have interest calculated on the principal sum due it.
In special ground 5, movants averred that the court erred in failing to charge in substance that the judgments bore interest from date at the rate of 8 per cent. per annum, and as a matter of law the Jefferson Banking Company would be entitled to recover interest at that rate on whatever principal sum the jury might find to be due. It is stated in this ground that the judge did instruct the jury as follows: "Now after September 18, 1915, you are instructed that the judgments provide only that 8 per cent. interest be paid on the principal amounts specified in the judgments annually, and you would not be authorized to calculate interest upon the unpaid interest after the date of the judgments, as provided in the notes, because such is not provided in the judgments taken thereon, and you would be authorized to calculate from the date of September 18, 1915, 8 per cent. per annum on what amount of principal you find might be due in making your calculation as to the payments if you find payments were made."
The charges complained of in ground 4 were in conformity with the pleadings and the evidence, and were not erroneous as contended. Bailey v. Turner, 150 Ga. 823 (supra). If the defendants desired further instructions upon the subject of interest (ground 5), a proper request should have been made.
As appears from question 6 as a whole, the jury were instructed to find separately the amounts, if any, of principal and interest due. Construed in the light of the issues and the judge's charge, the jury's answer to question 6 (b) was in plain effect a finding that payments had been made on the bank's execution sufficient to pay all interest, but leaving the entire principal of $3550 unpaid. This and the other findings of the jury, in so far as they were assailed as being unsupported by evidence, were not subject to such attack, unless it should be otherwise as to one item, concerning which, as shown in the first division of this opinion, no ruling is required.
5. The "motion to construe the verdict . . and to modify and change the decree" consisted of three parts, according to subjects *Page 646 
dealt with. Part 1 related to the item of $500 for the house that was destroyed. This matter has been determined in the defendant's favor in division 1 of this opinion, and requires no further ruling here. Part 2 contended that the effect and result of the answer of the jury to [question 6(b)] was to find that George W. Bailey was indebted to the Jefferson Banking Company in the sum of $3550 with interest and attorneys' fees and cost, and the finding of the jury of no interest on these items is wholly void and of no legal force or effect, and the Jefferson Banking Company was and is entitled to have and recover from George W. Bailey . . the principal sum of $3550" with interest thereon. In this part of the motion, the defendants prayed that the decree be modified so as to include interest and attorneys' fees on the principal found due to the Jefferson Banking Company, but there was no insistence in the brief upon attorneys' fees. As to interest, this part of the motion is controlled by what has just been ruled in division 4 of this opinion.
Part 3 alleged: "Question No. 7, propounded by the court to the jury, is ambiguous, the same being: `Has George W. Bailey overpaid John C. Turner, as executor of the will of Mrs. Sarah A. Turner, deceased, or the Jefferson Banking Company?' The answer being, `Yes,' does not establish whether the overpayment was made to John C. Turner as executor of the will of Mrs. Sarah A. Turner, or whether it was overpaid to the Jefferson Banking Company, and being insufficient to establish either proposition, it amounts to nothing and should be disregarded. If this answer is construed in connection with paragraph 8 of the question propounded . . as a finding that John C. Turner, as executor . . had been overpaid, then to the extent of the excess of $3550 over $680, said finding was and is wholly without evidence to support it, and should be disregarded, because: (a) John C. Turner testified in substance: `If I had such a contract as Mr. Bailey claimed, though I did not have such contract with him, and had agreed to allow the rents to liquidate the loan, the Sarah A. Turner estate would be overpaid at this time (August, 1943) about $680, with absolutely nothing paid to the Jefferson Banking Company. (b) There was no testimony of probative value in the record authorizing a finding contrary to the statement made by John C. Turner, and his testimony, construed in the light of the amounts actually *Page 647 
collected by him, shows that the payment was not completed until receipt of the rents for the year 1941." In this part of the motion, the defendants prayed "that the judgment entered by the court . . be modified to the extent of giving to" the plaintiff "a judgment for no amount whatever against John C. Turner, and in the alternative, should this prayer be by the court refused, that said judgment be for only $680." If question No. 7 and the answer thereto were ambiguous as insisted, the ambiguity was fully removed by questions 6(a) and 6(b) and the answers to these questions.
It was further insisted in the brief that the verdict to the extent that it found an overpayment of $3550 to the estate of Mrs. Turner was unauthorized by the evidence, in that it could not legally have gone beyond $680, the amount of the overpayment as stated by John C. Turner. A similar contention, though in reference to the charge of the court, was made in special ground 2 of the motion for new trial, and was ruled adversely to the defendants in division 2 of this opinion. See also the concluding statement in division 4.
It follows from what has been said that the judgments overruling (1) the motion for a new trial, and (2) the motion to construe the verdict and modify the original decree, must be affirmed, but with direction that the court write off the sum of $500 from the money judgment in the plaintiff's favor, as indicated in the first division of this opinion.
After this case was argued, the court invited briefs on the question whether the bill of exceptions complied with the rule which requires exception to a final judgment. At that time, however, a similar question was being considered in another case which had preceded the present case in this court, and in which the question has since been determined in a manner favorable to the present plaintiffs in error. Albany Federal Savings LoanAssn. v. Henderson, 198 Ga. 116 (31 S.E.2d 20). We have dealt with the instant case accordingly.
Judgment affirmed, with direction. All the Justices concur. *Page 648